Lee Gelernt*
Andre Segura*
Dror Ladin*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T: (212) 549-2660
*lgelernt@aclu.org*
*asegura@aclu.org*
*dladin@aclu.org*

Daniel J. Pochoda (Bar No. 021979)
James Duff Lyall (Bar No. 330045)**
ACLU FOUNDATION OF ARIZONA
3707 North 7th Street, Suite 235
Phoenix, AZ 85014
T: (602) 650-1854
F: (602) 650-1376
*dpochoda@acluaz.org*
*jlyall@acluaz.org*

Luis F. Parra (Bar No. 21570)
PARRA LAW OFFICES
571 North Grand Avenue
Nogales, AZ 85621
T: (520) 281-9369
F: (520) 281-1396
*lfparra@azmxlaw.com*

Roberto C. Montiel (Bar No. 003198)
ROBERTO MONTIEL LAW OFFICES
571 North Grand Avenue
Nogales, AZ 85621
T: (520) 281-2923
*lawrobertomontiel@hotmail.com*

*Attorneys for Plaintiffs*

(*Additional Counsel on Subsequent Pages*)

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| ARACELI RODRIGUEZ, individually and as the surviving mother and personal representative of the ESTATE OF J.A., Deceased,<br><br>    *Plaintiff*,<br><br>  v.<br><br>JOHN DOES 1–10, Agents of U.S. Border Patrol, and DOES 11–20, Officers of U.S. Customs and Border Protection,<br><br>    *Defendants*. | CASE NO. _____<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

*Additional Counsel*

Cecillia D. Wang*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-0770
F:  (415) 268-7522
*cwang@aclu.org*

Arturo J. Gonzalez*
Hector Suarez*
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
T:  (415) 268-7000
F:  (415) 268-7522
*agonzalez@mofo.com*
*hsuarez@mofo.com*

Mitra Ebadolahi*
ACLU FOUNDATION OF SAN DIEGO
AND IMPERIAL COUNTIES
P.O. Box 92138
San Diego, CA 92138-7131
T:  (619) 232-2121
F:  (619) 232-0036
*mebadolahi@aclusandiego.org*

* *Pro hac vice motions forthcoming*
** *Admitted pursuant to Ariz. Sup. Ct. R. 38(f)*

Plaintiff Araceli Rodriguez, through counsel, hereby complains and alleges the following:

**INTRODUCTION**

1. This civil rights case involves the brazen and lawless killing of a sixteen-year-old boy, J.A., by agents of the United States Border Patrol and/or officers of U.S. Customs and Border Protection (CBP). The fatal shooting of J.A. is not an isolated incident. United States Border Patrol agents have been responsible for multiple unjustified deadly shootings and physical abuses along the U.S.-Mexico border over the past several years. J.A.'s killing is one of the latest and most egregious of these incidents.

2. On the night of October 10, 2012, J.A., a Mexican national, was peacefully walking along a street in his hometown of Nogales, Sonora, Mexico. The street on which he was walking, Calle Internacional, runs parallel to the border fence. At approximately 11:30 pm, one or more U.S. Border Patrol agents and/or CBP officers standing on the U.S. side of the fence opened fire. An autopsy report shows that J.A. was fatally hit with ten bullets. At the time of the shooting, the agents and/or officers were not under threat by J.A. or anyone else standing near him — much less in immediate danger of deadly or serious bodily harm. J.A. death was senseless and unjustified.

3. J.A.'s mother, Araceli Rodriguez, brings this lawsuit for monetary damages for the killing of her youngest son, alleging claims under the Fourth and Fifth Amendments to the United States Constitution.

**JURISDICTION AND VENUE**

4. This case is brought pursuant to *Bivens* and the Fourth and Fifth Amendments to the United States Constitution. *See Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). The Court has jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction).

5. Venue is proper in the District of Arizona because a substantial part of the events complained of and giving rise to Plaintiff's claims occurred in this District. *See* 28 U.S.C. §§ 1391(b), 1391(e), 1402(b).

## PARTIES

6. Plaintiff ARACELI RODRIGUEZ is a Mexican national currently residing in Nogales, Sonora, Mexico. She is the mother of the deceased, J.A. who was also a Mexican national. J.A. resided in Nogales, Sonora, Mexico at the time of his death. Plaintiff brings this lawsuit individually and as the surviving mother and personal representative of J.A.'s estate.

7. Plaintiff is unaware of the true names and capacities, whether individual or otherwise, of Defendant DOES 1–10, Agents of U.S. Border Patrol, and DOES 11–20, Officers of U.S. Customs and Border Protection (hereinafter "DOE Defendants"), inclusive, and therefore sues those Defendants by fictitious names. Plaintiff is informed and believes, and on that basis alleges, that these DOE Defendants, and each of them, are in some manner responsible and liable for the acts and/or damages alleged in this Complaint, and that among these DOE Defendants are those Border Patrol agents who shot J. A. as well as others who directly contributed to J.A.'s death, and that all of these Defendants acted under color of law. The Border Patrol is an agency within the U.S. Customs and Border Protection agency, which itself is located within the Department of Homeland Security. Plaintiff will amend this Complaint to allege the DOE Defendants' true names and capacities when they have been ascertained.

## JURY DEMAND

8. Plaintiff demands a trial by jury in this action on each of her claims triable by jury.

**FACTS**

**J.A.'s Death**

9. On the night of October 10, 2012, after playing basketball in his neighborhood with his girlfriend and friends, J.A. was walking by himself down the sidewalk on Calle Internacional, a street that runs alongside the border fence on the Mexican side of the border between the United States and Mexico. Because Calle Internacional is a main thoroughfare, with commercial and residential buildings, residents of the town frequently walk down that street.

10. According to an eyewitness who was walking behind J.A. on Calle Internacional on that night, at approximately 11:30 pm, one or more U.S. Border Patrol agents and/or CBP officers, stationed on the U.S. side of the fence, opened fire. According to various reports, anywhere from 14 to 30 shots were fired. Upon information and belief, the agents and/or officers did not issue any verbal warnings before opening fire.

11. The agents and/or officers hit J.A. and he collapsed where he was shot, in front of a medical office on the corner of Calle Internacional and Calle Ingenieros. He was found moments later lying in a pool of his own blood.

12. J.A. was shot approximately ten times and virtually all of those shots entered his body from behind.

13. Upon information and belief, no one else was shot.

14. Just prior to the shooting, J.A. was visible and not hiding; an observer could see that he did not pose a threat. He was doing nothing but peacefully walking down the street by himself when he was gunned down. He was not committing a crime, nor was he throwing rocks, using a weapon, or in any way threatening U.S. Border Patrol agents or anyone else. Furthermore, no one near J.A. at the time of the shooting was throwing rocks or threatening U.S. Border Patrol agents in any manner (or threatening anyone else).

15. At the moment he was shot, J.A. was walking on the southern side of Calle Internacional, directly across the street from a sheer cliff face that rises approximately

25 feet from street level. The cliff is approximately 30 feet from where J.A. was standing when shot. The border fence, which is approximately 20–25 feet tall, runs along the top of the cliff. Thus, at the location where J. A. was shot, the top of the fence towers approximately 50 feet above street level on the Mexican side. The fence itself is made of steel beams that are 6.5 inches in diameter. Each beam is approximately 3.5 inches apart. The agents and/or officers who shot J.A. were firing from the U.S. side of the fence. (A photograph from Google Maps of the border fence and the corner where J.A. was killed is attached to this Complaint as Exhibit A.)

16. According to an emergency police dispatch, a Border Patrol agent phoned authorities in Mexico approximately five minutes after shots were fired. The agent informed Mexican authorities that there were shots fired on the borderline and that someone was wounded on the Mexican side, but the agent did not identify the shooters.

17. At the time of the shooting, J.A. lived in Nogales, Sonora, Mexico, approximately four blocks from where he was shot. Because J.A.'s mother was away for work, his grandmother was often with him in Nogales, Mexico to care for him. His grandmother and grandfather live in Arizona and were lawful permanent residents of the United States at the time of the shooting. They are now U.S. citizens. Upon information and belief, the agent(s) and/or officer(s) who shot J.A. did not know whether J.A. was a U.S. citizen or whether he had significant contacts with the United States.

18. Defendants' actions in killing J.A. were unreasonable and excessive, and were unnecessary to defend against bodily injury or deadly force. The agents and/or officers acted intentionally with the specific purpose of causing serious harm and/or death to J.A, without legal justification.

19. Defendants acted under color of law.

**Systemic Problems of Abuse at the Border by U.S. Agents**

20. J.A.'s killing by Defendants is unfortunately not a unique event, but part of a larger problem of abuse by Border Patrol agents in Nogales and elsewhere.

4

21. The U.S.-Mexico border area in Mexico is unlike other areas of Mexico. U.S. Border Patrol agents not only control the U.S. side of the fence, but through the use of force and assertion of authority, they also exert control over the immediate area on the Mexican side, including where J.A. was shot.

22. U.S. control of the Mexican side of the border fence in Nogales and other areas along the Southern border is apparent and longstanding, and recognized by persons living in the area.

23. Border Patrol agents use guns, non-lethal devices and other weapons, as well as military equipment and surveillance devices to target persons on the Mexican side of the border. For example, U.S. surveillance cameras are mounted along the border fence, monitoring activity on the Mexico side of the fence. One such camera, with a clear line of sight over Calle Internacional, is mounted approximately 150 feet from the location where J.A. was shot. Additionally, Border Patrol agents have opened fire into Nogales from the U.S. side on prior occasions and are known to launch non-lethal devices such as pepper spray canisters into Nogales neighborhoods from the U.S. side of the border fence. By shooting at individuals on the Mexican side, and using weapons and devices with a range extending to the Mexican side of the border area, the United States, through the Border Patrol, controls the area immediately adjacent to the international border fence on the Mexican side. This control extended to the street, Calle Internacional, where J.A. was killed.

24. U.S. Border Patrol agents, with force, exercise control over areas on the Mexican side adjacent to the international border fence. U.S. Border Patrol agents make seizures on the Mexican side of the fence. U.S. Bureau of Customs and Border Protection officials are authorized to be on Mexican soil to conduct pre-inspection of those seeking admission to the United States. U.S. Border Patrol helicopters fly in Mexican airspace near the border and swoop down on individuals, inundating those individuals with dust and debris. Thus, as the Chief of the U.S. Border Patrol has acknowledged, U.S. border security policy "extends [the nation's] zone of security outward, ensuring that our

5

physical border is not the first or last line of defense, but one of many." *Securing Our Borders—Operational Control and the Path Forward: Hearing Before the Subcomm. on Border and Maritime Security of the H. Comm. on Homeland Security*, 112th Cong. 8 (2011) (prepared statement of Michael J. Fisher, Chief of U.S. Border Patrol).

25. In recent years, physical abuse of persons near the border by U.S. Border Patrol agents has been rampant in Nogales and elsewhere. The Border Patrol consistently denies public access to basic information about its operations, including whether agents responsible for abuse are disciplined in any way, thus shielding the agency and individual agents from public accountability for abusive policies and practices. Even after many fatal shooting incidents involving Border Patrol agents, the agency has refused to release the names of those involved.

26. Based on an extensive investigation, the Arizona Republic found that between 2010 and 2012, the year J.A. was killed, there were 487 "use of force incidents" in the Border Patrol's Tucson Sector, 233 of which occurred in the Nogales area. *See* Bob Ortega and Rob O'Dell, *Force at the Border: Tucson Sector*, ARIZ. REPUBLIC (Dec. 16, 2013).

27. Reports also found that nationwide there were 15 deaths caused by Border Patrol agents in 2011–2012 alone, five of which occurred in the Tucson Sector. Thirteen of these deaths were caused by shootings. Another source found that CBP agents have killed 28 people since 2010. From 2005 to 2014, Border Patrol agents caused 46 deaths nationwide, according to media reports and data provided by the government.

28. A report by the American Immigration Council in May 2014 reviewed 809 complaints of alleged abuse by Border Patrol agents between 2009 and 2012 and found that "CBP officials rarely take action against the alleged perpetrators of abuse." AMERICAN IMMIGRATION COUNCIL, NO ACTION TAKEN: LACK OF CBP ACCOUNTABILITY IN RESPONDING TO COMPLAINTS OF ABUSE 3 (2014). The report noted that it was impossible to determine which cases had merit based on the data provided by

the government, but concluded that it was "astonishing that, among those cases in which a formal decision was issued, 97 percent resulted in 'No Action Taken.'" *Id.* at 1.

29. A former high ranking official at CBP has publicly stated: "With very serious misconduct—borderline criminal activity—senior management often gave Border Patrol agents a slap on the wrist or did nothing at all." Andrew Becker, *Removal of Border Agency's Internal Affairs Chief Raises Alarms*, HUFFINGTON POST (June 12, 2014).

30. In response to continuing public interest and controversy surrounding CBP's use of force policies and practices, and in particular to a letter sent by 16 members of Congress seeking information about CBP's use of force policies, CBP commissioned an external, independent review of its use of force policies and practices from the Police Executive Research Forum ("PERF"), a non-profit research organization comprised of experts on police practices. *See* POLICE EXEC. RESEARCH FORUM, U.S. CUSTOMS AND BORDER PROTECTION USE OF FORCE REVIEW: CASES AND POLICIES (2013). PERF reviewed all deadly force events from January 2010 through October 2012, including 67 case files related to CBP officers' use of deadly force. PERF subsequently provided CBP with a report and recommendations, detailing significant shortcomings in CBP use of force policies and practices, including the following:

   a) "It is not clear that CBP consistently and thoroughly reviews all use of deadly force incidents." (Report at 4);

   b) Too many cases [involving shootings at rock throwers] do not appear to meet the test of objective reasonableness with regard to the use of deadly force." (Report at 7);

   c) Of the 25 case files PERF reviewed involving shots fired by Border Patrol agents who responded to alleged rock throwing, "[s]ome cases seemed to be a clear cut self-defense reaction to close and serious rock threats or assaults, while other shootings were of more questionable justification. The more questionable cases generally involved shootings that took place through the IBF [International

7

1          Border Fence] at subjects who were throwing rocks at agents from Mexico."
2          (Report at 8).

3     31.   In September 2013, a report by the Department of Homeland Security
Office of Inspector General noted that "many agents and officers do not understand use of force and the extent to which they may or may not use force." Department of Homeland Security, Office of Inspector General, *CBP Use of Force Training and Actions to Address Use of Force Incidents* (Redacted) 17 (2013).

     32.   Upon information and belief, the agents and/or officers responsible for J.A.'s death are still employed by CBP and have not suffered disciplinary action.

**Harm Suffered by Plaintiff Because of Defendants' Actions**

     33.   There is a real and actual controversy between Plaintiff and Defendants, and Defendants' actions were the proximate cause of the death of Plaintiff's son.

     34.   Plaintiff and her son have suffered significant damages, in an amount to be proven at trial.

### CAUSES OF ACTION
### COUNT ONE
### VIOLATION OF THE FOURTH AMENDMENT

     35.   The foregoing allegations are re-alleged and incorporated herein by reference.

     36.   At the time J.A. was fatally shot, Defendants were not in danger of fatal or bodily harm from J.A. or anyone else.

     37.   In fatally shooting J.A., Defendants acted intentionally and used unreasonable and excessive force with the purpose of causing harm to J. A. without legal justification.

     38.   Defendants' actions violated the Fourth Amendment's prohibition against seizures with excessive and unreasonable force.

     39.   This claim is brought against all Defendants.

8

## COUNT TWO

## VIOLATION OF THE FIFTH AMENDMENT

40. The foregoing allegations are re-alleged and incorporated herein by reference.

41. At the time J. A. was fatally shot, defendants were not in danger of fatal or bodily harm from J.A. or anyone else.

42. In fatally shooting J. A., defendants acted intentionally, maliciously, and used unreasonable and excessive force, with the purpose to cause harm to J.A. without legal justification. Defendants' actions were unnecessary to achieve any legitimate law enforcement objective.

43. Defendants' actions were grossly excessive and deliberately indifferent, and shocked the conscience, in violation of the substantive due process component of the Fifth Amendment.

44. This claim is brought against all Defendants.

## RELIEF

WHEREFORE, Plaintiff respectfully requests relief as follows:

45. A declaration that Defendants' actions violated the Constitution.

46. Trial by jury.

47. Damages, including punitive damages, in an amount to be proven at trial.

48. Costs and reasonable attorney fees.

49. Such other relief as the Court deems just and equitable.

50. Demand for jury trial.

DATED: July 29, 2014

<u>/s/Luis F. Parra</u>
PARRA LAW OFFICES

<u>/s/Roberto C. Montiel</u>
ROBERTO MONTIEL LAW OFFICES

<u>/s/ Daniel J. Pochoda</u>
ACLU FOUNDATION OF ARIZONA

*Counsel for Plaintiff*