**Sean C. Chapman**
**Law Offices of Sean C. Chapman, P.C.**
100 North Stone Avenue, Suite 701
Tucson, Arizona 85701
Telephone: (520) 622-0747
Fax: (520) 628-7861
Arizona State Bar No. 012088
Attorney for Defendant
Sean@seanchapmanlaw.com

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| ARACELI RODRIGUEZ, ) | CASE NO.: CV-14-02251-TUC-RCC |
| ) | |
| Plaintiff, ) | |
| ) | **MOTION TO DISMISS FIRST** |
| v. ) | **AMENDED COMPLAINT** |
| ) | |
| JOHN DOES 1-10, Agents of U.S. ) | **(Under Seal)** |
| Border Patrol, and DOES 11-20, Officers ) | |
| of U.S. Customs and Border Protection, ) | |
| ) | |
| Defendants. ) | |

The Defendant, through undersigned counsel, Sean C. Chapman of THE LAW

OFFICES OF SEAN C. CHAPMAN, P.C., pursuant to Rule 12(b)(6) of the Federal

Rules of Civil Procedure, hereby moves this Court for an Order dismissing the First

Amended Complaint for failure to state a claim upon which relief can be granted.

Plaintiff has attempted to invoke the jurisdiction of this Court against Defendant

Border Patrol Agent Lonnie Swartz, in his individual capacity for violations of

Decedent's constitutional rights pursuant to *Bivens v. Six Unknown Named Agents of*

*the Federal Bureau of Narcotics*, 403 U.S. 388 (1971) and its progeny.

1

For the reasons set forth herein, Plaintiff is unable to state a claim upon which relief may be granted and, accordingly, their claim against Agent Swartz must be dismissed.

## I.    FACTS

The Complaint alleges[1] that on October 10, 2012 at about 11:30 p.m., Agent Swartz, while on duty as a Border Patrol Agent in Nogales, Arizona, fired shots across the international border. J.A., the decedent, a teenage boy, was at the time walking on the sidewalk on Calle Internacional in Nogales, Sonora, Mexico. This street runs parallel to the tall cliff upon which the steel beam border fence sits. J.A. was allegedly walking peacefully, alone, when he was shot. About five minutes after the shooting agents notified Mexican authorities that shots had been fired and someone on the Mexican side was wounded.

The Complaint further alleges that Agent Swartz's actions in firing across the border were without provocation or legal justification, thereby violating J.A.'s constitutional rights under the Fourth (unreasonable seizure) and Fifth (due process) Amendments.

. . .

. . .

---

[1] This recitation of facts is taken directly from the Complaint and does not constitute an admission as to their accuracy.

## II. PLEADING STANDARD

In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court must

accept as true all factual allegations in the complaint and draw all reasonable

inferences in favor of the nonmoving party. *Silvas v. E*Trade Mortg. Corp.*, 514 F.3d

1001, 1003 (9th Cir.2008). To survive such a motion, a complaint must allege "enough

facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 570 (2007). This "plausibility standard" means that a plaintiff must

plead facts sufficient to "nudge[] [a claim] across the line from conceivable to

plausible." *Id.* at 557.

Two years after *Twombly* was decided, the Court decided *Ashcroft v. Iqbal*, 556

U.S. 662 (2009), in which it held that a complaint also must have "facial plausibility,"

meaning that a plaintiff must plead factual content under Rule 8 of the Federal Rules

of Civil Procedure such that it allows the court to draw the reasonable inference that

the defendant is liable for the misconduct alleged. *Id.* at 678.[2] *Iqbal* also changed "the

tenet that a court must accept as true all of the allegations contained in the complaint"

finding that rule to be inapplicable to legal conclusions. *Id.* "Threadbare recitals of the

elements of a cause of action, supported by mere conclusory statements do not

---

[2] In *Ashcroft v. Iqbal*, the plaintiff brought an action against former Attorney General of the United States John Ashcroft and Director of the Federal Bureau of Investigation Robert Mueller, III, among others, pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

suffice." *Id.* The Court also held that "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679. As a result, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not show[n] – that the pleader is entitled to relief. *Id.* (quoting Fed.R.Civ.Proc. 8(a)(2)).

In ruling on such a motion, a court may not look beyond the face of the pleadings. *Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir.2004). A court must construe the pleadings in the light most favorable to the plaintiff, and must accept all material factual allegations in the complaint, as well as any reasonable inferences drawn therefrom. *Broam v. Bogan*, 320 F.3d 1023, 1028 (9th Cir.2003). Finally, a court may dismiss a claim if a successful affirmative defense appears clearly on the face of the pleadings. *Jones v. Bock*, 549 U.S. 199, 215 (2007)(citing Wright & Miller for rule that affirmative defense must appear on the face of the complaint).

As noted above, Plaintiff asserts that her claim against Agent Swartz, in his individual capacity, for deprivation of J.A.'s constitutional rights under the Fourth and Fifth Amendments to the United States Constitution, is derived from *Bivens*, *supra*. In *Bivens*, the Supreme Court held that money damages may be recovered against a federal official for violation of a plaintiff's constitutional rights. However, in order to prove a *Bivens* claim, a plaintiff must first demonstrate that he was deprived of a constitutional right. See *Shwarz v. United States*, 234 F.3d 428, 432 (9th Cir.2000).

There is no dispute that, at all times alleged in Plaintiff's First Amended Complaint, Border Patrol Agent Lonnie Swartz was acting within the course and scope of his employment and discretionary authority. As a result, he is entitled to dismissal of Plaintiff's claim based on qualified immunity. See *Chavez v. United States*, 682 F.3d 1102 (9th Cir.2012)(dismissing Fourth and Fifth Amendment *Bivens* claims against supervisory agents of the Border Patrol under Rule 12(b)(6) because qualified immunity protected agents from liability.)

## III.  QUALIFIED IMMUNITY

Qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments," and "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Messerschmidt v. Millender,* 132 S.Ct. 1235, 1244-45, citing *Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2085 (2011)(quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Id*. (citing *Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (citation omitted)).

Qualified immunity is not merely a defense. Rather, it provides a sweeping protection from the entirety of the litigation process. *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982). Indeed, qualified immunity guards against the "substantial social

costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties" that individual capacity lawsuits can entail. *Anderson*, 483 U.S. at 638. In *Anderson*, the Supreme Court made clear that the "driving force" behind creation of the qualified immunity doctrine was a desire to ensure that insubstantial claims against government officials be resolved prior to discovery. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Qualified immunity also "protect[s] the public by permitting its decision-makers to function without fear that an exercise of discretion might in retrospect be found to be error." *Cruz v. Beto*, 603 F.2d 1178, 1183 (5th Cir.1979) (citations omitted).

When law enforcement officers are sued for their conduct in the line of duty, courts must balance two competing needs: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231. This Court must apply a two-part test to determine which way the balance tips in a given case. *Id.* at 232; *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 915 (9th Cir.2012) (en banc). While the Court may begin with either part of the test, typically, taking the facts in the light most favorable to the plaintiff, the first inquiry is whether those facts demonstrate that the defendant officers violated one or more of the plaintiff's constitutional rights. *Pearson*, 555 U.S. at 236; *Maxwell v. Cnty. of San Diego*, 697 F.3d 941, 947 (9th Cir.2012); *Lacey*, 693 F.3d at 915. If the

answer to that question is "no," the matter is concluded, for without a violation there is no basis for the plaintiff's lawsuit to proceed. *Pearson*, 555 U.S. at 236.[3]

In order to defeat Agent Swartz's qualified immunity defense, Plaintiff's First Amended Complaint must show that the decedent had constitutional rights, which Agent Swartz violated. This, she has not done. The threadbare recitals of the elements of a cause of action offered by Plaintiff, supported by mere conclusory statements, are wholly insufficient and dismissal under Fed.R.Civ.Proc. 12(b)(6) is required.

## IV. CLEARLY ESTABLISHED CONSTITUTIONAL RIGHTS

A panel of the Fifth Circuit Court of Appeals recently decided a substantially similar case, *Hernandez v. United States*, 757 F.3d 249 (5th Cir.2014).[4] While the case has no precedential value in this Circuit, its reasoning serves as a good starting point for this Court's resolution of Plaintiff's claims. In *Hernandez*, a 15-year-old boy was shot and killed by a Border Patrol Agent while the boy was playing in a cement culvert

---

[3] If the answer to the first question is "yes," then for the second step of the qualified immunity analysis, the Court places the hypothetical reasonable officer in the same situation as the defendant officer, and then asks whether the reasonable officer also would have committed the act that the plaintiffs contend is unconstitutional. *Lacey*, 693 F.3d at 915. If the answer is "yes," the defendant officer is entitled to qualified immunity. *Id.* If the answer is "no," the plaintiffs' claim against the defendant officers may proceed. *Id.* Because Plaintiff is unable to establish that J.A. had extraterritorial rights under the Fourth or Fifth Amendments, Defendant has not addressed the second prong of the qualified immunity analysis. Defendant will, of course, provide any additional briefing this Court may require upon request to do so.

[4] A Petition for Rehearing *en banc* is pending before that Court. (See Dkt. Entry 7717432-2, filed August 29, 2014, in Fifth Cir. Docket No. 11-50792.)

separating the United States from Mexico. The parents of the decedent brought (among other claims not relevant here) a *Bivens* claim against the agent, Jesus Mesa Jr., based on the alleged violation of the Fourth Amendment's prohibition against unreasonable seizures and the Fifth Amendment's guarantee of substantive due process.

The panel began by identifying its framework for determining whether Agent Mesa was entitled to qualified immunity. The panel primarily relied on *Boumediene v. Bush*, 553 U.S. 723 (2008), in which the Supreme Court, for the first time, held that the Constitution's prohibition on suspensions of the writ of habeas corpus applied to certain aliens detained outside the United States. 553 U.S. at 771. In reaching that holding, the Court considered "three factors . . . relevant in determining the reach of the Suspension Clause: (1) the citizenship and status of the detainee and the adequacy of the process through which that status determination was made; (2) the nature of the sites where apprehension and detention took place; and (3) the practical obstacles inherent in resolving the prisoner's entitlement to the writ." *Id.* at 766. The Court expressly noted that it was "only" holding "that petitioners before us are entitled to seek the writ." *Id.* at 795.

*Boumediene* does not establish that J.A. had Fourth or Fifth Amendment rights, which would require the case to "have placed" that "constitutional question beyond debate." *Ashcroft* v. a*l-Kidd*, 131 S. Ct. at 2083. The Court's opinion was "'explicitly

confined . . . "only" to the extraterritorial reach of the Suspension Clause'" (i.e. the ability of a detainee to seek a Writ of Habeas Corpus). *Ali* v. *Rumsfeld*, 649 F.3d 762, 771 (D.C. Cir.2011)(quoting *Rasul v. Myers*, 563 F.3d 527, 529 (D.C. Cir.2009)(in turn quoting *Boumediene,* 553 U.S. at 795)). Nowhere did *Boumediene* suggest it was overruling *Verdugo-Urquidez* or *Eisentrager* (discussed below); on the contrary, the Court cited both cases without any indication that their holdings are no longer law. *Boumediene,* 553 U.S. at 759-60, 762-63.

The Supreme Court has explicitly instructed lower courts to follow directly applicable precedents, which in this case are *Eisentrager*, *Verdugo-Urquidez*, and *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001), not *Boumediene*. *See, e.g.*, *Tenet* v. *Doe*, 544 U.S. 1, 10-11 (2005)(if decision "has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions" (internal quotation marks omitted)). The D.C. Circuit, citing the limited and focused nature of *Boumediene*, has held that *Boumediene* "[d]isclaimed any intention to disturb existing law governing the extraterritorial reach of any constitutional provisions, *other* than the Suspension Clause." [emphasis added.] *See Ali*, 649 F.3d at 771; *Rasul*, 563 F.3d at 529.  To the extant that the *Hernandez* Court did that, it's holding contravenes well-settled law.

For these reasons, this Court should not rely on *Beaumediene* to extend Fourth

or Fifth Amendment rights extraterritorially to J.A. In addition, qualified-immunity

questions must be answered "in light of the specific context of the case, not as a broad

general proposition." *Brosseau* v. *Haugen*, 543 U.S. 194, 198 (2004)(per curiam)

(internal quotation marks omitted). The Supreme Court has thus "repeatedly"

admonished courts "not to define clearly established law at a high level of generality."

*al-Kidd*, 131 S. Ct. at 2084. Reliance on *Boumediene,* therefore, and its "practical and

functional" balancing test, which applied only to the Suspension Clause, would

contradict this principle.

A. <u>The Fourth Amendment Does Not Protect a Non-Citizen With No</u>
<u>Connections to the United States</u>

Plaintiff alleges that Agent Swartz's actions violated J.A.'s Fourth Amendment

protection against seizures with excessive and unreasonable force, an injury which

indisputably occurred in Mexico. (First Amended Complaint, ¶¶ 35-38.) The Fourth

Amendment provides in relevant part that "[tlhe right of the people to be secure in

their persons, houses, papers, and effects, against unreasonable searches and seizures,

shall not be violated.. . ." U.S. CONST. amend. IV. The question, therefore, is whether

the Fourth Amendment applies extraterritorially under the circumstances presented

here. Based on the reasoning set forth below, the answer is "No."

In *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990),[5] the Supreme Court

held that an alien with no voluntary attachment to the United States has no

extraterritorial Fourth Amendment rights. *Id.* at 274-275. In so finding, the Court

explained that aliens only receive constitutional protections when they have come

within the territory of the United States and develop substantial connections with this

country. *Id.* at 271, 274-275. The substantial connections test requires that an alien

have significant voluntary connection with the United States and have accepted some

societal obligations here. *Id.* at 271-273. *Cf. Ibrahim v. Department of Homeland Sec.*,

669 F.3d 983 (9th Cir.2012)(applying the "significant voluntary connection" test under

*Verdugo-Urquidez* and *Boumediene,* Plaintiff voluntarily established a connection to

the United States during her four years at Stanford University; she voluntarily departed

from the U.S. to present the results of her research at a Stanford-sponsored conference;

the purpose of her trip was to further, not sever, her connection to the United States;

and, she intended her stay abroad to be brief.)

---

[5] DEA officers, working in conjunction with Mexican federal police, seized incriminating documents from the Mexican residences of a criminal defendant. 494 U.S. at 262-63. The district court granted the defendant's motion to suppress, holding that "the Fourth Amendment applied to the searches and that the DEA agents had failed to justify searching [the defendant's] premises without a warrant." 494 U.S. at 263. The court of appeals affirmed. *Id.* The Supreme Court reversed, holding that that "the Fourth Amendment has no application" where "[a]t the time of the search, [the individual seeking its protections] was a citizen and resident of Mexico with no voluntary attachment to the United States, and the place searched was located in Mexico." *Id.* at 274-75.

In the *Hernandez* case, the panel agreed that it was bound to apply the sufficient connections test set forth in *Verdugo-Urquidez* to the Plaintiffs' *Bivens* claim, but that it must do so in light of *Boumediene*'s general function approach. *Hernandez*, 757 F.3d at 266.[6] Under this rubric, the panel held that "Hernandez lacked sufficient voluntary connections with the United States to invoke the Fourth Amendment" because he was not a citizen of the United States, did not demonstrate an interest in entering the United States, or accept some societal obligation, including even the obligation to comply with our immigration laws. *Id.* (citations omitted.)

Practical considerations also factored into the panel's reluctance to extend the Fourth Amendment on these facts. Citing the uniqueness for Fourth Amendment purposes of the 2,000-mile long border between the United States and Mexico, the panel found that:

> "'[a]pplication of the Fourth Amendment to [these] circumstances could significantly disrupt the ability of the political branches to respond to foreign situations involving our national interest' and could also plunge Border Patrol agents 'into a sea of uncertainty as to what might be reasonable in the way of searches and seizures conducted abroad.'"

*Id.* at 267, citing *Verdugo-Urquidez*, 494 U.S. at 273-74. Judge Dennis wrote a concurring opinion expressing his concern "for pragmatic and political questions" that

---

[6] The panel recognized numerous decisions from other Circuit Courts of Appeal that relied on *Verdugo-Urquidez*'s interpretation to limit the Fourth Amendment's extraterritorial effect. 757 F.3d at 265.

would arise from the extraterritorial application of the Fourth Amendment under these circumstances. *Id.* at 281. For all of those reasons, the panel concluded that the Fourth Amendment does not apply to the alleged seizure of Hernandez, occurring outside of the United States and involving a foreign national. *Id.* at 267.

Similarly here, Plaintiff's First Amended Complaint states that the Plaintiff is a Mexican national who resides in Nogales, Sonora, Mexico. She is the mother of the deceased, who was also a Mexican National. (First Amended Complaint, ¶ 6.) At no time prior to the shooting did J.A. enter the United States and, moreover, the Complaint does not allege that J.A. had any connection whatsoever to the United States. (First Amended Complaint, ¶¶ 6, 9, 11, 15, 17.) Because J.A. had no connection with the United States, let alone a "significant voluntary connection," and Plaintiff's First Amended Complaint makes no allegation that he had accepted any societal obligation in the United States, J.A. was not protected by the Fourth Amendment of the United States Constitution. *Id.*, *Verdugo-Urquidez*, 494 U.S. at 273.

B. <u>Plaintiff's Fifth Amendment Due Process Claim Must Be Dismissed</u>

Plaintiff alleges that Agent Swartz's actions violated J.A.'s Fifth Amendment guarantee of substantive due process. (First Amended Complaint, ¶¶ 40-42.)  The Fifth Amendment to the Constitution provides in relevant part that "[n]o person shall. . . be deprived of life, liberty, or property, without due process of law." U.S. CONST.

amend. V. This constitutional protection contains both a substantive and a procedural component. The substantive component "prevents the government from engaging in conduct that 'shocks the conscience' or interferes with rights 'implicit in the concept of ordered liberty,' " whereas the procedural component ensures that any government action surviving substantive due process scrutiny is "implemented in a fair manner." *Hernandez*, 757 F.3d at 267, quoting *United States v. Salerno*, 481 U.S. 739, 746 (1987)(citations omitted).

Dismissal of this claim is compelled because: (1) it is not properly brought under the Fifth Amendment; (2) even if Plaintiff has a cognizable Fifth Amendment due process claim, it has no extraterritorial effect; and (3) extending Fifth Amendment due process rights under these circumstances would constitute an unwarranted application of *Bivens* to a new context.

    1.   *There is No Cognizable Fifth Amendment Claim Alleged in the Complaint.*

In *Graham v. Connor*, 490 U.S. 386, 395 (1989), the Supreme court held that "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." In other words, "*Graham ... requires* that if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth

Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *United States v. Lanier*, 520 U.S. 259, 272 n. 7 (1997) (emphasis added)(citing *Graham*, 490 U.S. at 394). As stated in *John Corp. v. City of Houston*, 214 F.3d 573, 582 (5th Cir.2000), "The purpose of *Graham* is to avoid expanding the concept of substantive due process where another constitutional provision protects individuals against the challenged governmental action."

The gravamen of Plaintiff's Complaint is that Agent Swartz used excessive and unreasonable force against J.A..[7] *Graham* unequivocally provides that "*[A]ll* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment ... ." 490 U.S. at 395 (emphasis added.) While not all encounters between law enforcement offices and citizens are seizures for purposes of the Fourth Amendment, a seizure occurs "when the officer, by means of physical force

---

[7] Paragraph 42 of the First Amended Complaint alleges that Agent Swartz acted "deliberately indifferent." While a government officer may be liable for due process violations which result from his failure to adequately supervise or train his subordinates, the inadequacy of police training may serve as a basis for liability under section 1983 or *Bivens* "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Ting v. United States*, 927 F.2d 1504, 1512 (9th Cir.1991), quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). Plaintiff does not allege that Agent Swartz served in a supervisory capacity; therefore, the Complaint fails to state a plausible claim that J.A.'s due process rights (even if he had them), were violated as a result of deliberate indifference.

or show of authority, has in some way restrained the liberty of [the] citizen." *Terry v. Ohio*, 392 U.S. 1, 19 (1968). Apprehension by the use of deadly force is a seizure. *Tennessee v. Garner*, 471 U.S. 1, 7 (1985)("[T]here can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment."); *Brower v. County of Inyo,* 489 U.S. 593, 596–97 (1989) (a seizure is a "governmental termination of freedom of movement through means intentionally applied" and a "seizure occurs even when an unintended person or thing is the object of the detention or taking"); *see also County of Sacramento v. Lewis*, 523 U.S. 833, 843 (1998)(substantive due process analysis is inappropriate where respondents claim constitutes a search or seizure because such claims are covered by the Fourth Amendment).

Putting the above weight of authority to the contrary aside, Plaintiff attempts to allege conduct that invokes the principle that substantive due process protects individuals from arbitrary deprivation of life, liberty or property by the government. *Lewis*, 523 U.S. at 845. It was on this basis that two judges on the *Hernandez* panel found the Plaintiffs' claim was not covered by the Fourth Amendment and could therefore be asserted as a Fifth Amendment violation of due process. *Hernandez*, 757 F.3d at 268. Plaintiff's attempt to invoke the Fifth Amendment should be rejected because it does not rely on clearly established law. *See, e.g.*, *House* v. *Hatch*, 527 F.3d 1010, 1022 (10th Cir.2008) ("The most straightforward case [of a lack of clearly

established law] is where the Supreme Court has expressly declined to decide an issue." (alteration in original; internal quotation marks omitted)); *Martinez-Aguero v. Gonzalez*, 459 F.3d 618, 624 n.5 (reserving the question whether the Fourth Amendment is the exclusive means of bringing excessive-force claims where, as here, "the protection of the Fourth Amendment is unavailable."). *Graham* clearly requires Plaintiff's claim to be analyzed under the Fourth Amendment, rather than the Fifth Amendment's due process clause and, accordingly, the Complaint fails to state a Fifth Amendment claim upon which relief may be granted.

### 2. The Fifth Amendment Does Not Protect a Non-Citizen With No Connection to the United States

Even if Agent Swartz's alleged conduct plausibly violated the Fifth Amendment, J.A. was not entitled to substantive due process because he neither came within the territory of the United States nor developed substantial connections with this country to justify its extraterritorial application.

As *Verdugo-Urquidez* noted, the Supreme Court has previously "rejected the claim that aliens are entitled to Fifth Amendment rights outside the sovereign territory of the United States." 494 U.S. at 269 (citing *Johnson* v. *Eisentrager*, 339 U.S. 763 (1950)); *see Zadvydas,* 533 U.S. at 693 (citing *Verdugo-Urquidez* and *Eisentrager* for the proposition that the "Fifth Amendment's protections do not extend to aliens outside the territorial boundaries"). In *Eisentrager*, the Supreme Court held that the

petitioners, who were held by the U.S. in Germany in military custody, could not invoke the protections of the Fifth Amendment because they were aliens "beyond the territorial jurisdiction of any court of the United States." 339 U.S. at 778. In rejecting the claimed constitutional right, the Supreme Court "referred nine times to the decisive fact that the alien prisoners were, at all relevant times, outside sovereign U.S. territory." *Rasul* v. *Myers*, 563 F.3d at 531; *see also Martinez-Aguero* v. *Gonzalez*, 459 F.3d at 622 (characterizing *Eisentrager* as "reject[ing] extraterritorial application of the Fifth Amendment"); *Kiyemba* v. *Obama*, 555 F.3d 1022, 1026-28 (D.C. Cir.2009), *vacated,* 559 U.S. 131, *reinstated,* 605 F.3d 1046, 1047 (D.C. Cir.2010)(per curiam). *Compare Plyler v. Doe,* 457 U.S. 202, 211 (1982)(holding that aliens have due process protections when *within* the territorial jurisdiction of the United States).

These precedents demonstrate that J.A. did not have clearly established constitutional rights at the time of the alleged incident at the border. J.A. was, according to the complaint, in sovereign Mexican territory at the time of his death. (First Amended Complaint, ¶¶ 2, 9.) There is no alleged connection with the United States at all; therefore, J.A. did not have sufficient voluntary, substantial connection with the United States that could possibly support the clear application of the Fifth Amendment's due process guarantees in this context. *Compare Verdugo-Urquidez*, 494 U.S. at 272 (presence in the United States "for only a matter of days" insufficient to establish voluntary connections), *with Martinez-Aguero*, 459 F.3d at 625 (alien who

made "regular and lawful entry of the United States pursuant to a valid border-crossing card" and was present in the United States at the time of the alleged beating had sufficient voluntary connections to possess Fourth Amendment rights).

Nevertheless, the *Hernandez* majority found that the Court's holding in *Boumediene* supplanted *Verdugo-Urquidez*'s significant connections test with a functional approach under which the absence of *de jure* jurisdiction was not determinative. *Id.* at 269, citing *Boumediene*, 553 U.S. at 766. The majority acknowledged, however, that citizenship is the first relevant factor under *Boumediene* and that the decedent's alienage weighed against extraterritorial application. *Id.* at 268-69.

In order to satisfy *Boumediene*'s second factor, pertaining to the level of control the United States exerted over the site where the injury occurred, the majority examined the nature of the border area where the shooting occurred and the political history of the location to understand how the United States might exercise control. *Id.* at 269-270. Plaintiff here has attempted to make this showing in paragraphs 22-24 of the First Amended Complaint.[8] Plaintiff asserts, for example, that persons living in the

---

[8] Paragraphs 25-31 of the First Amended Complaint summarize Plaintiff's belief that Border Patrol agents systemically abuse their authority near the border through failed use of force policies. These allegations in have no factual or legal relevance to Plaintiff's claims; thus their purpose must to be paint an emotionally charged picture of the landscape underlying Plaintiff's claims. They have no place in the Complaint and should be disregarded as hyperbolic surplussage.

area of the border "recognize" U.S. control of the Mexican side of the border fence in

Nogales. This statement has no factual or legal import and should be disregarded as

mere opinion, which has no place in a Complaint. Plaintiff also asserts that

surveillance cameras mounted along the border fence demonstrate U.S. control of

Mexican territory, but this example is preposterous. Cameras are used to enforce our

immigration laws and border security by monitoring unlawful entry into the United

States at locations along the border other than the Port of Entry. The same is true of

pre-inspection activities and Border Patrol fly-overs, which Plaintiff acknowledges is

accomplished through official channels with the authority of the Mexican government.

Plaintiff also presents a quote from the Chief of the Border Patrol to support her claim,

but it does not. The entire statement by Michael J. Fisher on February 11, 2011 can be

found online at www.dhs.gov/news/2011/02/15/us-customs-and-border-protection-

border-patrol-chief-michael-fishers-testimony. The portion quoted by Plaintiff appears

in the Introduction, with the Chief explaining the agency's multi-layered approach to

create a "zone of security" that extends "outward." He did not imply, as the Complaint

suggests, that Borer Patrol activities extend south of the U.S. border, but rather, that

coordinated efforts with law enforcement, law-makers and public and private sector

actors have improved the agency's effectiveness at the U.S. border with Mexico. What

is left is Plaintiff's allegation that the U.S. has exerted a sort of brute force control of

at least part of Nogales, Sonora, Mexico, by shootings such as occurred here. None of

these allegations, even if true, establish the type of extraterritorial control by the United States that is required to satisfy *Boumediene*'s second factor.

In *Boumediene*, the Supreme Court applied the Suspension Clause to prisoners held at Guantanamo Bay in part because the United States exercises "complete jurisdiction and control over the base," which the Court took to be a form of "de facto sovereignty" supporting application of the Suspension Clause there. 553 U.S. at 755, 763. The fact that a border agent has the capacity to fire a weapon onto some portions of Mexican territory does not remotely approach the type of "complete jurisdiction and control" that the Court found relevant in *Boumediene*.

Similarly, *Boumediene* held that aliens detained at Guatanamo Bay have Suspension Clause rights in spite of, not because of, their alienage and location abroad. *See* 553 U.S. at 770 (noting that "before today the Court has never held that noncitizens detained" abroad "have any rights under our Constitution"). And once again, *Boumediene* made Guantanamo Bay detainees' "enemy" status and the process afforded to them relevant to determining the reach of the Suspension Clause - a constitutional provision designed to test the lawfulness of executive detention. The Court made no suggestion that its decision reached, let alone clearly established an answer to, the question whether an alien has Fifth Amendment due process rights in this context.

There are few, if any, similarities between the control by the United States of Guantanamo Bay and its presence in the area of Nogales, Sonora, Mexico close to the international border. Indeed, the third *Hernandez* panel member, Judge DeMoss, Jr., wrote a dissent to take issue with the majority's conclusion on this point. He said, "[a]t its heart, this determination is based on the "dubious assessment" that there is an undefined area on the Mexican side of the U.S.-Mexico border which is analogous to the United States Naval Station at Guantanamo Bay, Cuba," which is based on both a lease and a treaty *Id.* at 281. Judge DeMoss rejected the proposition that occasional exercises of "hard power across the border" and practices such as "preinspection examination and inspection of passengers" have somehow transformed a portion of northern Mexico into something resembling the U.S. presence at Guantanamo Bay. *Id.* Furthermore, Judge DeMoss expressed concern that the majority's opinion left unanswered important questions relating to the territorial reach of the decision, such as how wide is the strip of land Mexico where the Fifth Amendment applies? Does it apply in all of Ciudad Juarez or the entire state of Chihuahua? *Id.* The majority's approach, according to Judge DeMoss, "devolves into a line drawing game which is entirely unnecessary because there is a border between the United States and Mexico." *Id.* Finally, Judge DeMoss characterized the majority's "significant expansion" of the Fifth Amendment's due process clause as unsupported by precedent. As a result he would find that the Fifth Amendment does not protect a non-citizen with no

connection to the United States who suffers an injury in Mexico, where the United States has no formal control or de facto sovereignty. *Id.* at 281-82.

For all of the reasons set forth above, this Court should find that J.A., did not have extraterritorial Fifth Amendment due process rights, and then dismiss the claim under Rule 12(b)(6).

### 3. *Extending the Fifth Amendment Extraterritorially Under These Circumstances Would Constitute an Unwarranted Application of Bivens to a New Context.*

After concluding that the Fifth Amendment could apply to the northern border area of Mexico, the *Hernandez* majority took great pains to decide that an individual should have a *Bivens* remedy arising under the Fifth Amendment "against a federal law enforcement officer for his alleged conscience-shocking use of excessive force across our nation's borders." *Id.* at 272-77. This conclusion is unsupported and should not be followed by this Court.

As already discussed in Part IV.B.1, in *Bivens* itself the Supreme Court recognized a Fourth Amendment claim for unreasonable search and seizure against federal law enforcement agents. *Bivens*, 403 U.S. at 397. Excessive force claims are also recognized under the Fourth Amendment, including claims involving deadly force. *Graham*, 490 U.S. at 395 ("[A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment ... .".) It is

unnecessary, therefore, to extend *Bivens* liability to a new context or new category of defendants, which the Supreme Court has consistently refused to do. *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001). Indeed, the Supreme Court recently canvassed its opportunities since 1980 to extend *Bivens* to a new context and noted it declined to do so in each and every case. *Minneci v. Pollard*, 132 S.Ct. 617, 622-23 (2012)(No *Bivens* remedy would be implied to federal prisoner seeking damages from privately employed personnel working at a privately operated federal prison, where the conduct allegedly amounts to a violation of the Eighth Amendment, and where that conduct is of a kind that typically falls within the scope of traditional state tort law.) Because a *Bivens* remedy already exists under the Fourth Amendment, it is improper to extend *Bivens* in order to breathe life into Plaintiff's Fifth Amendment claim.

Denying damages under *Bivens* in this case would not create a legal vacuum at the U.S./Mexico border. The actions of Agent Swartz are subject to review by the FBI, the Department of Homeland Security, and attorneys from the U.S. Attorney's Office, as well as the Civil Rights Division of the Department of Justice, each of whom has the resources and authority to conduct an extensive criminal investigation. Indeed, in this very case the United States Attorney's Office has declared a conflict of interest with respect to representing Agent Swartz because of the criminal investigation that is currently underway. In addition, Plaintiff may file claims against the United States based on the Federal Tort Claims Act, 28 U.S.C. §1346(b) or the Alien Tort Claims

Act, 28 U.S.C. §1350.  And finally, the DOJ and United States Government can also work together within existing mechanisms and agreements to prevent future similar incidents.

The fact that Agent Swartz was standing in the United States when he allegedly fired his weapon into Mexico is not the operative fact that is determinative of the legal issue here. Rather, the question is whether J.A., who was abroad at the time of the incident, had any clearly established constitutional rights. The Fifth Amendment's due process clause does not confer abstract, free-floating limits on government action, but rather are personal rights possessed by, and particular to, individuals. *See, e.g.*, *United States v. Pno-Noriega*, 189 F.3d 1089, 1094 (9th Cir.1999)(describing rights under the Fourteenth Amendment's due process clause, among others, as "personal.") Whether an individual is entitled to invoke those personal protections crucially depends on a number of factors, including the individual's citizenship and location, *see Eisentrager*, 339 U.S. at 778; *Verdugo-Urquidez*, 494 U.S. at 271-72. This focus would make no sense if it applied to everyone in the world so long as the challenged action of the government official originated in the territorial United States.

*Verdugo-Urquidez*, for example, involved a search that occurred in Mexico, but was planned and ordered from a DEA office in California in order to obtain evidence for a trial occurring in the United States. 494 U.S. at 262. The Court, however, never once hinted that this domestic element of the challenged course of conduct was

separately subject to constitutional stricture, and its holding that aliens outside the territory of the United States have no Fourth Amendment rights shows that the opposite is true. *Id.* at 271-72. Though Agent Swartz is alleged to have fired his weapon from U.S. soil, any unreasonable "seizure" of J.A. within the meaning of the Fourth Amendment or violation of the Fifth Amendment did not occur until the bullet allegedly struck him in Mexico. *See California* v. *Hodari D.*, 499 U.S. 621, 624-26 (1991)(mere "show of authority" without any "application of physical force to restrain movement" not a seizure); *Lytle* v. *Bexar County*, 560 F.3d 404, 410 (5th Cir.2009) (seizure in deadly force case occurred when the "bullet struck" the plaintiff).

Similarly, in *Ali* v. *Rumsfeld,* the D.C. Circuit considered a *Bivens* action alleging that various federal officials, including former Secretary of Defense Donald Rumsfeld, violated the plaintiffs' constitutional rights by formulating policies that caused them to be mistreated while detained in Iraq and Afghanistan—mistreatment that included alleged rape, sexual humiliation, and the intentional infliction of pain after surgery. 649 F.3d at 765-66. The Court applied *Eisentrager* and *Verdugo-Urquidez* to hold that the detainees, because they were detained abroad, lacked any clearly established rights under the Fifth Amendment due process clause or the Eighth Amendment, and therefore that Secretary Rumsfeld and other defendants were entitled to qualified immunity, *id.* at 770-72 (citing *Rasul*, 563 F.3d at 529-31 (in turn citing

*Eisentrager* and *Verdugo-Urquidez*)) - even though the challenged policy-making on the part of former Secretary Rumsfeld occurred in the United States.

There are troubling implications of Plaintiff's argument that Fourth and Fifth Amendment protections apply to the entire world population so long as the official act originated within the United States. When the United States government protects the Nation's security by directing the use of force abroad from within the borders of the United States, the mere fact that actions directing the use of force occur in the United States surely does not stretch the Fourth and Fifth Amendments to all four corners of the globe. Virtually any claim of injury in a foreign country can be "repackaged" as a claim "based on a failure to train, a failure to warn, the offering of bad advice, or the adoption of a negligent" – or as here, unconstitutional - "policy" in the United States. *Sosa* v. *Alvarez-Machain*, 542 U.S. 692, 702-03 (2004).

*Ali*, a *Bivens* suit that alleged unconstitutional policymaking having effects in foreign territory, illustrates that the danger is hardly hypothetical. Plaintiff's hypothesis would threaten[] to swallow . . .whole," *Sosa*, 542 U.S. at 703, the normal analysis governing the extraterritorial application of constitutional rights, and "could significantly disrupt the ability of the political branches to respond to foreign situations involving our national interest," *Verdugo-Urquidez*, 494 U.S. at 273-74. These considerations certainly constitute special factors counseling hesitation in extending *Bivens*. *Minneci*, 132 S.Ct. at 621.

The *Hernandez* panel was misguided in its analysis of the factors warranting an extension of *Bivens* under these circumstances. For the reasons set forth above, this Court should decline to follow that decision and instead find that *Bivens* should not be extended to apply here.

## V. CONCLUSION

Plaintiff's claims must be analyzed under the Fourth Amendment, which does not apply extraterritorially to J.A. Even if the Court concluded that J.A. had rights under the Fourth or Fifth Amendments, their extraterritorial application under the circumstances presented here is far from clearly established; consequently, *Bivens* cannot be extended to cover Plaintiff's claims.

For the reasons set forth herein, the First Amended Complaint must be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).

RESPECTFULLY SUBMITTED this 6th day of November, 2014.

LAW OFFICES OF SEAN C. CHAPMAN, P.C.

By:   /s/Sean Chapman
Sean C. Chapman

Electronically mailed this 6th day of November 2014 to:

Clerk of the Court
United States District Court

Lee Gelernt
Andre Segura
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
lgelernt@aclu.org
asegura@aclu.org

Daniel J. Pochoda
James Duff Lyall
ACLU FOUNDATION OF ARIZONA
3707 North 7th Street, Suite 235
Phoenix, AZ 85014
dpochoda@acluaz.org
jlyall@acluaz.org

Luis F. Parra
PARRA LAW OFFICES
571 North Grand Avenue
Nogales, AZ 85621
lfparra@azmxlaw.com

Roberto C. Montiel
ROBERTO MONTIEL LAW OFFICES
571 N. Grand Avenue
Nogales, AZ 85621
lawrobertomontiel@hotmail.com

Cecillia D. Wang
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
cwang@aclu.org

Mitra Ebadolahi
ACLU FOUNDATION OF SAN DIEGO
AND IMPERIAL COUNTIES
P.O. Box 92138

San Diego, CA 92138-7131
mebadolahi@aclusandiego.org

Arturo J. Gonzalez
Hector Suarez
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105
agonzalez@mofo.com
hsuarez@mofo.com


Serena Lara