# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Araceli Rodriguez, | No. 4:14-CV-02251-RCC |
| Plaintiff, | |
| v. | **ORDER** |
| Lonnie Swartz, | |
| Defendant. | |

## INTRODUCTION

This case calls on the Court to answer two challenging questions: 1) whether a Mexican national standing on the Mexican-side of the United States and Mexico border at the time of the alleged violation can avail himself of the protections of the Fourth and Fifth Amendments of the United States Constitution when a U.S. Border Patrol agent standing in the United States uses excessive force against him; and 2) whether a U.S. Border Patrol agent may assert qualified immunity based on facts he found out after the alleged violation.

Specifically before the Court are Plaintiff Araceli Rodriguez' First Amended Complaint ("FAC") (Doc. 18), Defendant Lonnie Swartz' Fed.R.Civ.P. Rule 12(b)(6) Motion to Dismiss (Doc. 30), Rodriguez' Response (Doc. 46), and Swartz' Reply (Doc. 49). The Court heard oral arguments on this matter on May 26, 2015.  For the reasons stated below, the Court grants in part and denies in part Swartz' Motion to Dismiss.

//

# BACKGROUND

The Court sets forth the following factual background and hereby imparts that these statements are reiterations of Rodriguez' allegations which may or may not be a complete and accurate rendition of the facts of this case. *See* (Doc. 18). At this stage in the proceedings, Swartz has made no concessions as to the veracity of Rodriguez' allegations nor presented any contravening facts; such facts are not required when filing a Rule 12(b)(6) motion to dismiss.

1. Rodriguez brings this suit on behalf of her deceased minor son, J.A.  (Doc. 18 at ¶¶ 3, 6).

2. On the night of October 10, 2012, J.A. was walking home alone down the sidewalk of Calle Internacional, a street that runs alongside the border fence on the Mexican side of the border between the United States and Mexico. (Doc. 18 at ¶ 9).

3. According to an eyewitness who was walking behind J.A. that night, a Border Patrol agent stationed on the U.S. side of the fence, now known to be Swartz, opened fire.  According to various reports, Swartz fired anywhere from 14 to 30 shots.  Upon information and belief, Swartz did not issue any verbal warnings before opening fire. (Doc. 18 at ¶ 10).

4. J.A. was shot approximately ten times and collapsed where he was shot.  Virtually all of the shots entered his body from behind. Upon information and belief, no one else was shot. (Doc. 18 at ¶¶ 11-13).

5. Immediately prior to the shooting, J.A. was visible and not hiding—he was peacefully walking down the street by himself. Eyewitnesses state that he did not pose a threat and was not committing a crime, throwing rocks, using a weapon or threatening U.S. Border Patrol agents or anyone else prior to being shot. (Doc. 18 at ¶ 14).

6. At the moment he was shot, J.A. was walking on the southern side of Calle Internacional, directly across the street from a sheer cliff face that rises approximately 25 feet from street level. The cliff is approximately 30 feet from where J.A. was standing when shot. The border fence, which is approximately 20-25 feet tall, runs along the top of the cliff. Thus, at the location where J.A. was shot, the top of the fence towards approximately 50 feet above street level on the Mexican side. The fence itself is made of steel beams that are 6.5 inches in

diameter.  Each beam is approximately 3.5 inches apart from the next. (Doc. 18 at ¶ 15).

7. At the time of the shooting, J.A. lived in Nogales, Sonora, Mexico, approximately four blocks from where he was shot. Because J.A's mother (Plaintiff, Araceli Rodriguez) was away for work, J.A.'s grandmother often visited Nogales, Mexico to care for him. J.A.'s grandmother and grandfather live in Arizona and were lawful permanent residents of the United States at the time of the shooting. They are now U.S. citizens.  (Doc. 18 at ¶ 17).

8. Swartz fired from the U.S. side of the fence. Swartz acted under color of law when shooting J.A. Upon information and belief, Swartz did not know whether J.A. was a U.S. citizen or whether J.A. had any significant contacts with the United States. (Doc. 18 at ¶¶ 17, 19).

9. J.A.'s killing by Swartz is not a unique event, but part of a larger pattern of shootings by Border Patrol agents in Nogales and elsewhere.  (Doc. 18 at ¶ 20).

10. The U.S.-Mexico border area of Mexico is unlike other areas of Mexico.  U.S. Border Patrol agents not only control the U.S. side of the fence, but through the use of force and assertion of authority, also exert control over the immediate area on the Mexican side, including where J.A. was shot. (Doc. 18 at ¶ 21).

11. U.S. control of the Mexican side of the border fence in Nogales and other areas along the Southern border is apparent and longstanding, and recognized by persons living in the area. (Doc. 18 at ¶ 22).

12. Border Patrol agents use guns, non-lethal devices and other weapons, as well as military equipment and surveillance devices to target persons on the Mexican side of the border.  For example, U.S. surveillance cameras are mounted along the border fence, monitoring activity on the Mexican side of the fence.  Additionally, Border Patrol agents have opened fire into Nogales from the U.S. side on prior occasions and are known to launch non-lethal devices such as pepper spray canisters into Nogales neighborhoods from the U.S. side of the border fence. (Doc. 18 at ¶ 23).

13. U.S. Border Patrol agents exercise control over areas on the Mexican side of the border adjacent to the international border fence.  U.S. Border Patrol agents make seizures on the Mexican side of the fence.  U.S. Bureau of Customs and Border Protection officials are authorized to be on Mexican soil to conduct pre-inspection of those seeking admission to the United States.  U.S. Border Patrol helicopters fly in Mexican airspace near the border and swoop down on individuals.  (Doc. 18 at ¶ 24).

14. The Chief of the U.S. Border Patrol has acknowledged that U.S. border security policy "extends [the United States'] zone of security outward, ensuring that our physical border is not the first or last line of defense, but one of many." *Securing Our Borders—Operation Control and the Path Forward: Hearing Before the Subcomm. on Border and Maritime Security of the H. Comm. on Homeland Security*, 112th Cong. 8 (2011) (prepared by Michael J. Fisher, Chief of U.S. Border Patrol). (Doc. 18 at ¶ 24).

## LEGAL STANDARD

"On a motion to dismiss under Rule 12(b)(6), a court must assess whether the complaint 'contains sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Chavez v. U.S.*, 683 F.3d 1102, 1108 (9th Cir. 2012) (*citing Ashcroft v. Iqbal*, 556 U.S. 662, 678; *Bell Atl. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1108-09; see also *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007). In determining plausibility, the court must accept as true all material factual allegations in the complaint, construe the pleadings in the light most favorable to the plaintiff and make any reasonable inferences therefrom. *Broam v. Bogan*, 320 F.3d 1023, 1028 (9th Cir. 2003). A court may dismiss a claim if a successful affirmative defense appears clearly on the face of the pleadings. *Jones v. Bock*, 549 U.S. 199, 215 (2007).

## DISCUSSION

### I. *Bivens*, the extraterritorial application of the U.S. Constitution and qualified immunity

Rodriguez asserts her claims against Swartz in his individual capacity for deprivation of J.A.'s constitutional rights under the Fourth and Fifth Amendments to the United States Constitution. (Doc. 18 at p.8). *See Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388 (1971). In *Bivens*, the Supreme Court of the United States held that money damages may be recovered against a federal official for

violation of a plaintiff's constitutional rights. In order to successfully allege a *Bivens* claim, a plaintiff must plead factual matter demonstrating that he was deprived of a clearly established constitutional right. *Iqbal*, 556 U.S. at 666.

Swartz argues that Rodriguez cannot state a claim that J.A. was deprived of a constitutional right because J.A., a Mexican citizen without substantial voluntary connections to the United States and standing on Mexican soil at the time of the alleged violation, is not entitled to the protections of the Fourth and Fifth Amendments of the United States Constitution. Should this Court hold that J.A. was protected by either or both Amendments, Swartz asserts that he is entitled to qualified immunity because J.A.'s rights pursuant to the Fourth or Fifth Amendments were not clearly established at the time of the alleged violation.

Rodriguez responds by arguing that this Court need not analyze this case as an extraterritorial application of the United States Constitution because Swartz' conduct took place entirely within the United States. Should the Court consider the extraterritorial application of the Constitution, Rodriguez asserts that J.A. was protected by both the Fourth and Fifth Amendments even while on Mexican soil. Rodriguez further avers that Swartz should not be entitled to qualified immunity because he knew it was a crime to fatally shoot a Mexican citizen across the border without justification, and because Swartz did not know J.A.'s legal status or citizenship when he shot J.A., such that qualified immunity should not apply post-hoc Swartz' awareness of J.A.'s citizenship.

**II.    *Hernandez v. United States et al*. is persuasive, not controlling, authority**

The parties' arguments before this Court are framed in reference to *Hernandez v. United States*, 757 F.3d 249 (5th Cir. 2014), a case with very similar arguments to those now before the Court:

On June 7, 2010, Sergio Adrian Hernandez Guereca, a fifteen-year-old Mexican national, was on the Mexican side of a cement culvert that separates the United States from Mexico. *Id*. at 255.  Sergio had been playing a game with his friends that involved running up the incline of the culvert, touching the barbed-wire fence separating Mexico

and the United States, and then running back down the incline. *Id.* U.S. Border Patrol Agent Jesus Mesa, Jr. arrived on the scene and detained one of Sergio's friends, causing Sergio to retreat and hide behind the pillars of a bridge on the Mexican side of the border. *Id.* Mesa, still standing in the United States, then fired at least two shots at Sergio, one of which struck Sergio in the face and killed him. *Id.*

Sergio's parents filed suit against the United States, unknown federal employees, and Mesa. *Id.* Similarly to the case before this Court, the claim against Mesa was made pursuant to *Bivens* for violations Sergio's Fourth and Fifth Amendment rights through the use of excessive, deadly force. *Id.* Mesa moved to dismiss the claims against him asserting qualified immunity and arguing that Sergio, as an alien injured outside the United States, lacked Fourth or Fifth Amendment protections. *Id.* at 256. The U.S. District Court for the Western District of Texas agreed and dismissed the claims against Mesa. *Id.* Sergio's parents appealed.

A divided three judge panel of the Court of Appeals for the Fifth Circuit held that in Sergio's case when, "an alleged seizure occur[s] outside of [the U.S.] border and involving a foreign national—the Fourth Amendment does not apply." *Id.* at 267. Nevertheless, the panel majority also held "that a noncitizen injured outside the United States as a result of arbitrary official conduct by a law enforcement officer located in the United States may invoke the protections provided by the Fifth Amendment." *Id.* at 272. The panel further found that *Bivens* extends to an individual located abroad who asserts the Fifth Amendment right to be free from gross physical abuse against federal law enforcement agents located in the United States based on their conscience-shocking, excessive use of force across our nation's borders. *Id.* at 277. Finally, the panel held that the facts alleged in the complaint defeated Mesa's claim of qualified immunity stating: "It does not take a court ruling for an official to know that no concept of reasonableness could justify the unprovoked shooting of another person." *Id.* at 279-80 (citing *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

Upon Mesa's motion, the Fifth Circuit Court of Appeals agreed to rehear

*Hernandez* en banc. 771 F.3d 818 (5th Cir. 2014). In a per curiam decision, a unanimous Fifth Circuit Court of Appeals affirmed the district court's dismissal of both counts against Mesa holding that Sergio's parents failed to allege a violation of the Fourth Amendment, and that Sergio's Fifth Amendment rights were not "clearly established" when he was shot. *Hernandez v. United States et al.*, --- F.3d --- (5th Cir. April 24, 2015); 2015 WL 1881566, at *1. In holding Sergio's Fifth Amendment rights were not "clearly established," the Fifth Circuit Court of Appeals gave allegiance to the general rule of constitutional avoidance and bypassed the issue of whether Sergio was entitled to constitutional protection as a noncitizen standing on foreign soil. *Id.* at *2. At least three judges wrote concurring opinions on the matter—each attempting to reconcile and apply various Supreme Court holdings (including *Johnson v. Eisentrager*, 399 U.S. 763 (1950); *Reid v. Covert*, 354 U.S. 1 (1957); *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990); and *Boumediene v. Bush*, 553 U.S. 723 (2008)) to facts unique to the Fifth or any other circuit.

Swartz urges the Court to follow the Fifth Circuit Court of Appeals' en banc decision and dismiss both of Rodriguez' claims based on theories of constitutional extraterritoriality and qualified immunity. Rodriguez avers that *Hernandez* was wrongly decided and holds no precedential value in this Circuit. The Court agrees that *Hernandez* is not controlling authority in this circuit. All the same, the Court has been guided by the thorough historical and legal analysis of the complex issues addressed in the Fifth Circuit Appellate judges' opinions and utilized the *Hernandez* decisions as a frame of reference. Nevertheless, while *Hernandez* shares many similar arguments to the case at hand, this Court evaluates Rodriguez' case on the facts alleged in her First Amended Complaint, on the arguments made by the parties' in their pleadings, and in light of the Ninth Circuit Court of Appeal's applicable and controlling case law.  Applying this Circuit's case law to the facts of this specific case, this Court respectfully disagrees with the Fifth Circuit Court of Appeals and arrives at a different conclusion as outlined below.

//

### III.      J.A.'s seizure occurred in Mexico

The Court begins with Rodriguez' contention that there is no need to analyze J.A.'s seizure as an extraterritorial application of the constitution because Swartz' conduct occurred entirely within the United States. To support her position, Rodriguez cites to use the language in footnote sixteen of *Wang v. Reno*, 81 F.3d 808, 818 n.16 (9th Cir. 1996) stating that the government's conduct in the United States can constitute a violation abroad. However, the Court in *Wang* clearly stated that "[t]he deprivation [of Wang's due process rights] occurred on American soil when Wang was forced to take the witness stand," and that the actions taken while Wang was abroad were "inextricably intertwined with the ultimate violation." *Id*.  Such is not the same in the present case where the ultimate violation, J.A.'s seizure, occurred entirely in Mexico.

A seizure occurs "only when there is a governmental termination of freedom of movement…" *Brower v. Cnty of Inyo*, 489 U.S. 593, 596-97 (1989). In this case, J.A. was not seized when Swartz shot at him, but when the bullets entered J.A.'s body and impeded further movement. As such, any constitutional violation that may have transpired materialized in Mexico. Accordingly, the Court now turns to the question of whether the Fourth and/or Fifth Amendments of the United States Constitution protect J.A. outside the United States. [1]

### IV.      Rodriguez' claim that Swartz violated J.A.'s Fourth Amendment rights survives

A.       Both *Boumediene* and *Verdugo-Urquidez* apply

The Supreme Court of the United States "has discussed the issue of the Constitution's extraterritorial application on many occasions." *Boumediene*, 553 U.S. at 755-71. However, it was not until 2008's *Boumediene v. Bush* that the Supreme Court held for the first time that noncitizens detained by the United States government in

---

[1] The Court also rejects as unpersuasive Rodriguez' argument pursuant to *Asahi Metal Indus. Co. v. Superior Court of Cal.*, 480 U.S. 102, 113 (1987): that judicial proceedings, and therefore, any government actions that could violate the litigants' rights take place inside the United States. *Asahi* focused on when a state court could exercise personal jurisdiction over a foreign corporation. Jurisdiction is not at issue in this case.

territory over which another country maintains de jure sovereignty have any rights under the United States Constitution. *Id.* at 771 (addressing whether the Suspension Clause has full effect at Naval Station in Guantanamo Bay in case where aliens detained as enemy combatants sought the Writ of Habeas Corpus).

In their pleadings, the parties disagree as to which standard the Court should apply to decide whether the Fourth and Fifth Amendments of the United States Constitution apply in this case. Swartz argues that *Boumediene* is limited to the Suspension Clause and inapplicable in the present case. Further, Swartz avers that the "voluntary connections" test announced in *Verdugo-Urquidez*' controls Rodriguez' Fourth Amendment claim. *Verdugo-Urquidez*, 494 U.S. at 261, 271 (holding that the Fourth Amendment does not apply to the search and seizure by United States agents of property owned by a nonresident and located in a foreign country where nonresident had no voluntary connection to the United States). Rodriguez responds that *Verdugo-Urquidez*' "voluntary connections" test was repudiated by the Supreme Court in *Boumediene* where the Court applied a "general functional approach" and "impracticable and anomalous" standard when determining the extraterritoriality of the United States Constitution. 553 U.S. at 755-72.

The Fifth Circuit Court of Appeals grappled with this very question in addressing *Hernandez* and decided to apply *Verdugo-Urquidez*' "sufficient connections requirement" in light of *Boumediene*'s "general functional approach" as to the Fourth Amendment claim. *Hernandez*, 757 F.3d at 266. In arriving at this conclusion, the Fifth Circuit Court of appeals rejected 1) Defendant Mesa's argument that the Constitution does not guarantee rights to foreign nationals injured outside the sovereign territory of the United States, 2) the district court's finding that *Boumediene* was limited to the Suspension Clause, and 3) the plaintiffs' argument that the Court should ignore *Verdugo-Urquidez* in light of *Boumediene*. *Id.* at 260, 262, and 265. Applying both standards, the appellate court considered the fact that Hernandez lacked: American citizenship, territorial presence in the United States, interest in entering the United States, acceptance

of societal obligations, and sustained connections to the United States. *Id.* Additionally, the Court weighed several practical considerations in determining whether Hernandez was protected by the Fourth Amendment including the uniqueness of the border. *Id.* at 266-67 (discussing the limited application of the Fourth Amendment during searches at the border, national self-protection interests, the increase of Border Patrol agents at the southwest border, and the use of sophisticated surveillance systems). Ultimately, the appellate court found that Hernandez was not entitled to the protections of the Fourth Amendment based on the facts alleged.

The Ninth Circuit Court of Appeals similarly determined that <u>both</u> *Boumediene's* "functional approach" factors and *Verdugo-Urquidez'* "significant voluntary connection" test applied in the case of a woman seeking to assert her rights under the First and Fifth Amendments of the United States Constitution. *Ibrahim v. Dep't of Homeland Sec.*, 669 F.3d 983, 994-97 (9th Cir. 2012). The Court found a comparison of Ibrahim's case with *Verdugo-Urquidez*, *Eisentrager*, and *Boumediene* instructive in rejecting the government's bright-line "formal sovereignty-based" test and in holding that the plaintiff had established voluntary connections to the United States during her studies at an American university. *Id.* at 995-97. Similarly, this Court finds an analysis of these cases instructive in finding that both *Boumediene*'s functional approach factors and *Verdugo-Urquidez* "voluntary connections" test apply in this case.

In 1950's *Eisentrager*, the Supreme Court of the United States found that German citizens who had been arrested in China, convicted of violating the laws of war after adversary trials before a U.S. military tribunal in China, and sent to a prison in Germany to serve their sentences did not have the right to seek the Writ of Habeas Corpus under the United States Constitution. 339 U.S. at 770-77 (considering (a) petitioners' status as enemy aliens; (b) lack of previous territorial presence or residence in the United States; (c) capture and custody by U.S. military as prisoners of war; (d) convictions by Military Commission sitting outside the United States; (e) for offenses against laws of war committed outside the United States; and (f) at all times imprisoned outside the United

States.)

In 1990's *Verdugo-Urquidez*, a Mexican-national was extradited from Mexico to face drug charges in the United States. 494 U.S. at 262. While awaiting trial, American law enforcement agents working with Mexican authorities performed a warrantless search of Verdugo-Urquidez' Mexican residences and seized various incriminating documents. *Id.* The criminal defendant sought to suppress this evidence and alleged violations of his Fourth Amendment rights. *Id.* at 263. The Supreme Court of the United States considered the text and history of the Fourth Amendment, as well as Supreme Court cases discussing the application of the Constitution to aliens extraterritorially. The Supreme Court found that under the circumstances (where Verdugo-Urquidez was a citizen and resident of Mexico with no voluntary attachment to the United States and the place to be searched was located in Mexico), the Fourth Amendment had no application. *Id.* at 274-75. Concurring in the opinion, Justices Kennedy and Stevens each wrote separately to address the fact that applying the Warrant Clause to searches of noncitizens' homes in foreign jurisdictions would be impractical and anomalous due to practical considerations. *Id.* at 275-79.

In 2008's *Boumediene*, the plaintiffs were aliens who had been designated as enemy combatants, were detained at the United States Naval Station in Guantanamo Bay, Cuba, and sought the Writ of Habeas Corpus. 553 U.S. at 732. The government argued that because of their status as enemy combatants and their physical location outside the sovereignty of the United States, they had no constitutional rights and no privilege to Habeas Corpus. *Id.* at 739. The Supreme Court rejected the government's argument instead finding that "questions of extraterritoriality turn on objective factors and practical concerns, not formalism." *Id.* at 764. In so holding, *Boumediene* addressed both *Eisentrager* and *Verdugo-Urquidez* and found both of these decisions to stand for the proposition that the extraterritorial reach of the constitution depends upon "practical considerations" including the "particular circumstances, the practical necessities, and the possible alternatives which Congress had before it" and in particular, whether judicial

- 11 -

enforcement of the provision would be "impracticable and anomalous." *Id.* at 759-66.

In *Ibrahim*, the Court of Appeals for the Ninth Circuit considered that Ibrahim was unlike the plaintiffs in *Eisentrager*—she had not been convicted of, or even charged with violations of any law. 669 F.3d at 996. On the other hand, Ibrahim shared an important similarity with the plaintiffs in *Boumediene*—she sought the right to assert constitutional claims in a civilian court in order to correct what she contended was a mistake. *Id.* at 997. Here, J.A. was also unlike the plaintiffs in *Eisentrager*—he had not been charged with or convicted of violating any law. Similarly to the plaintiffs in *Boumediene*, J.A. was on foreign soil when he was seized by American forces and now seeks to assert that his seizure was unlawful. Per this Circuit's precedent in *Ibrahim* and the Supreme Court's reasoning in *Boumediene*, this Court sees no reason why *Boumediene* should not apply in this case. Because *Verdugo-Urquidez* has not been overruled and considers the Fourth Amendment explicitly, this Court finds that it must also apply the "voluntary connections" test. In sum, this Court finds most appropriate to apply the "practical considerations" outlined in *Boumediene* in conjunction with *Verdugo-Urquidez*' "voluntary connections" test to evaluate whether J.A. was protected by the Fourth Amendment.

B.   The facts alleged in this case weigh in favor of establishing that J.A. was entitled to the protections of the Fourth Amendment of the U.S. Constitution

The Supreme Court stated three factors relevant to determining the extraterritorial application of the Constitution (specifically the Suspension Clause) in *Boumediene*: (1) the citizenship and status of the claimant, (2) the nature of the location where the constitutional violation occurred, and (3) the practical obstacles inherent in enforcing the claimed right. 553 U.S. at 766-71. The relevant obstacles included, but were not limited to, the consequences for U.S. actions abroad, the substantive rules that would govern the claim, and the likelihood that a favorable ruling would lead to friction with another country's government. *Id.* at 766. The Court considers these along with the "voluntary connections" test outlined in *Verdugo-Urquidez* to find that Rodriguez can assert J.A.'s rights pursuant to the Fourth Amendment.

To begin, the Court considers J.A.'s citizenship, status, and voluntary connections to the United States. J.A. was a sixteen-year-old Mexican citizen. *See* Doc. 18 at ¶¶ 1-2. At the time Swartz seized him, J.A. was not suspected of, charged with, or convicted of violating any law. Just prior to the shooting, J.A. was visible and not hiding. *Id.* at ¶14. Observers stated that he did not pose a threat, but was peacefully walking down the street. *Id.* He was not committing a crime, nor was he throwing rocks, using a weapon, or in any way threatening U.S. Border Patrol agents or anyone else. *Id.* Further, J.A. was not a citizen of a country with which the United States are at war, nor was he engaged in an act of war or any act that would threaten the national security of the United States. *Id.* Thus, J.A.'s status was that of a civilian foreign national engaged in a peaceful activity in another country, but within the U.S.'s small-arms power to seize. The Court here finds that while J.A.'s nationality weighs against granting him protection pursuant to the Fourth Amendment, his status as a civilian engaged in peaceful activity weighs in favor of granting him protection despite the fact that J.A. was in the territory of another country when he was seized.

As to substantial voluntary connections to the United States, this Court finds that J.A. had at least one. J.A. and his family lived within the region formerly called "ambos Nogales," or "both Nogales," referring to the adjacent towns of Nogales, Arizona and Nogales, Sonora—once adjacent cities flowing into one-another, now divided by a fence. *Id.* at ¶ 17. In particular, J.A. had strong familial connections to the United States. Both his grandparents were legal permanent residents (now citizens) of the United States residing in Nogales, Arizona. *Id.* J.A.'s grandmother would often cross the border into Mexico to care for J.A. while his mother worked. *Id.* Further, J.A.'s home in Nogales, Sonora, Mexico was within four blocks' distance from the U.S.-Mexico border. *Id.* Living in such proximity to this country, J.A. was likely well-aware of the United States' (and specifically the U.S. Border Patrol's) *de facto* control and influence over Nogales, Sonora, Mexico. *Id.* at ¶¶ 17, 21-24.

//

The Court here considers these same factors in assessing the nature of the location where the alleged constitutional violation occurred.[2] Specifically, the Court considers Rodriguez' factual allegations that the U.S.-Mexico border is unlike other areas of Mexico. *Id.* at ¶¶ 21-24. "U.S. Border Patrol agents not only control the U.S. side of the fence, but through the use of force and assertion of authority, they also exert control over the immediate area on the Mexican side, including where J.A. was shot." *Id.* at ¶ 21. "U.S. control of the Mexican side of the border fence in Nogales and other areas along the Southern border is apparent and longstanding, and recognized by persons living in this area." *Id.* at ¶ 22. "Border patrol agents use guns, non-lethal devices and other weapons, as well as military equipment and surveillance devices to target persons on the Mexican side of the border....Border Patrol agents have opened fire into Nogales from the U.S. side on prior occasions and are known to launch non-lethal devices such as pepper spray canisters into Nogales neighborhoods from the U.S. side of the border fence. By shooting individuals on the Mexican side of the border area, the United States, through Border Patrol, controls the area immediately adjacent to the international border fence on the Mexican side. This control extended to the street, Calle Internacional, where J.A. was killed." *Id.* at ¶ 23. The Court finds this factor to weigh in favor of granting J.A. constitutional protection pursuant to the Fourth Amendment.

The Court also considers the practical obstacles inherent in enforcing the claimed right. These considerations include the nature of the right asserted, the context in which the claim arises, and whether recognition of the right would create conflict with a foreign sovereign's laws and customs. *Boumediene*, 553 U.S. at 755-65. The nature of the right asserted here is the right to be free from unreasonable seizures—specifically, the fundamental right to be free from the United States government's arbitrary use of deadly force. *See* Doc. 18 at ¶¶ 35-38. The claim here arises as a lawsuit in a United States court

---

[2] *See Hernandez v. United States*, 757 F.3d 249, 267 (5th Cir. 2014) (outlining the scope of the U.S. Border Patrol's presence and influence along the U.S.'s southwest border with Mexico.) *See also Boumediene*, 553 U.S. at 754 ("Our cases do not hold it is improper for us to inquire into the objective degree of control the Nation asserts over foreign territory.")

and asks that this court apply U.S. constitutional law to the actions of a U.S. Border Patrol agent firing his weapon from within the United States. *Id.* at ¶¶ 4-5.; *Cf. Boumediene*, 553 U.S. at 759-64 (discussing practical considerations of providing plaintiffs with ability to assert their rights abroad). Rodriguez has provided documentation from the Mexican government such that there would be no conflict with Mexico's laws and customs if this Court afforded J.A. protection under the Fourth Amendment. *See* Doc. 46-1. The Court finds that these factors weigh in favor of granting J.A. protection under the Fourth Amendment.

Finally, the Court gives weight to the Supreme Court's concerns in *Verdugo-Urquidez*—that applying the Fourth Amendment to the warrantless search and seizure of a Mexican national's home in Mexico "could significantly disrupt the ability of the political branches to respond to foreign situations involving our national interest" and could also plunge U.S. law enforcement and military agents "into a sea of uncertainty as to what might be reasonable in the way of searches and seizures conducted abroad." 494 U.S. at 273-74; *see also Hernandez*, 757 F.3d at 267 (noting that extending the Fourth Amendment protections to a Mexican national on Mexican soil might carry a host of implications for U.S. Border Patrol's use of sophisticated surveillance systems (including mobile surveillance units, thermal imaging systems, unmanned aircrafts and other large- and small-scale non-intrusive inspection equipment per, *Kyllo v. United States*, 533 U.S. 27, 40 (2001))).

The Court here finds that such concerns are ameliorated by the fact that this case does not involve the Warrant Clause of the Fourth Amendment, magistrate judges, or the issuance of warrants and/or the searches and seizure of property abroad. This case addresses only the use of deadly force by U.S. Border Patrol agents in seizing individuals at and near the United States-Mexico border. U.S. Border Patrol agents are already trained in the limits of the Fourth Amendment when addressing citizens and non-citizens alike when these individuals place foot within the United States. *See, e.g.* 8 C.F.R. § 287.8(a)(2). These agents would require no additional training to determine when it is

appropriate to use deadly force against individuals (whether citizens or noncitizens alike) located on the Mexican side of the United States-Mexico border.

Weighing all of the aforementioned factors, this Court finds that J.A. was entitled to protection pursuant to the Fourth Amendment. The Court acknowledges that it has arrived at a different conclusion from that of the Court of Appeals for the Fifth Circuit in *Hernandez v. U.S.*, 757 F.3d at 267. This Court respectfully disagrees with how the Circuit Court weighed some factors, but bases its decision to extend J.A. protection pursuant to the Fourth Amendment on the facts alleged in Rodriguez' First Amended Complaint and this Court's own analysis of the relevant case law. (Doc. 18). At its heart, this is a case alleging excessive deadly force by a U.S. Border Patrol agent standing on American soil brought before a United States Federal District Court tasked with upholding the United States Constitution—that the deceased was a Mexican national standing on Mexican soil at the time the violation occurred is but one of the many practical considerations and factors the Supreme Court of the United States has ordered the lower courts to consider. Pursuant to the facts presented before this Court in Rodriguez' First Amended Complaint, the factors outlined in *Verdugo-Urquidez* and *Boumediene* weigh in favor of extending J.A. constitutional protection pursuant to the Fourth Amendment.

**V.      Rodriguez' claim pursuant to the Fifth Amendment is dismissed**

Rodriguez' First Amended Complaint alleges that Swartz' actions violated J.A.'s Fifth Amendment guarantee of substantive due process. In his motion to dismiss, Swartz alleges that Rodriguez' Fifth Amendment claim is improperly before this Court as a substantive due process violation that is best analyzed pursuant to the Fourth Amendment.

In fact, the Supreme Court of the United States has held that "all claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive

due process' approach." *Graham v. Connor,* 490 U.S. 386, 395 (1989); *see also Albright v. Oliver*, 510 U.S. 266, 273 (1994); *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 843 (1998). "Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." *Id.*

Finding both that J.A. was 'seized' and that his excessive force claim pursuant to the Fourth Amendment may proceed, this Court hereby grants Swartz' motion to dismiss Rodriguez' claim pursuant to the Fifth Amendment because Swartz conduct is more properly analyzed under the Fourth Amendment. In dismissing Rodriguez' Fifth Amendment claim, this Court does not reach Rodriguez' argument that J.A. should be entitled to protection under the Fifth Amendment's prohibition against arbitrary deprivation of life if this Court were to find that the Fourth Amendment did not protect J.A. *See* Doc. 46 at pp. 21-22.

## VI.    Swartz is not entitled to qualified immunity

Qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments," and "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Messerchmidt v. Millender*, 132 S.Ct. 1235, 1244-45, citing *Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2085 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally runs on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Id.*

Courts are to analyze this question from the perspective "of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight" and thus allow "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396.

Qualified immunity is not merely a defense. Rather, it provides a sweeping protection from the entirety of the litigation process. *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982). Indeed, qualified immunity guards against the "substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). When law enforcement officers are sued for their conduct in the line of duty, courts must balance between "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

Judges are to exercise their sound discretion in deciding which of the two prongs of qualified immunity analysis should be addressed first in light of the circumstances of the particular case. *Id.* at 236. The first inquiry is whether the facts demonstrate that the defendant officer violated one or more of plaintiff's constitutional rights. *Id.* If the answer is "no," the matter is concluded because without a violation there is no basis for plaintiff's lawsuit to proceed. *Id.* If the answer is "yes," the court must decide whether the right at issue was "clearly established" at the time of the alleged misconduct. *Id.* at 232. A right is clearly established where "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (citations omitted). Qualified immunity is only applicable where both prongs are satisfied. *Pearson*, 555 U.S. at 232.

Having previously found that J.A. was protected by the Fourth Amendment, the two questions remaining before the Court are 1) whether the FAC alleges sufficient facts to establish the plausibility that Swartz violated J.A.'s constitutional right to be free from unreasonable seizures and 2) whether the right was clearly established at the time of the violation.   Both of these questions are to be analyzed accepting facts alleged in Rodriguez' First Amended Complaint as true and making all reasonable inferences in favor of Rodriguez. Accordingly, the Court finds that Rodriguez alleges sufficient facts to

establish the plausibility that Swartz violated J.A.'s Fourth Amendment rights. Further, the Court finds that J.A.'s rights were clearly established when Swartz seized him such that Swartz is not entitled to assert qualified immunity.

Over thirty years ago, the Supreme Court of the United States established that law enforcement officers could not use deadly force on an unarmed suspect to prevent his escape. *Brosseau v. Haugen*, 543 U.S. 194, 203 (2004) (J. Breyer concurring) ("The constitutional limits on the use of deadly force have been clearly established for almost two decades. In 1985 [the Supreme Court of the United States] held that the killing of an unarmed burglar to prevent his escape was an unconstitutional seizure.") (citing *Tennessee v. Garner*, 471 U.S. 1 (1985)). This means that for over thirty years, law enforcement officers have been well-aware that it is unlawful (and in violation of an individual's Fourth Amendment rights to be free from unreasonable seizures) to use deadly force against an unarmed suspect to prevent his escape. Additionally, officers are also aware that in "obvious cases" rights can be "clearly established" even without a body of relevant case law. *See Hope*, 536 U.S. at 738 (citing *U.S. v. Lanier*, 520 U.S. 259, 270-271 (1997)).

The facts alleged in the First Amended Complaint are that J.A. was peacefully walking home and was not engaged in the violation of any law or threatening anyone when Swartz shot him at least ten times. (Doc. 18 at ¶¶ 10, 14). As alleged in Rodriguez' First Amended Complaint, this is not a case involving circumstances where Swartz needed to make split-second judgment—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation. Instead, the facts alleged in the First Amended Complaint, demonstrate an "obvious case" where it is clear that Swartz had no reason to use deadly force against J.A.

Swartz attempts to differentiate this case from other deadly force cases by alleging that at the time he shot J.A., it was not clearly established whether the United States Constitution applied extraterritorially to a non-citizen standing on foreign soil. Yet, at the time he shot J.A., Swartz was an American law enforcement officer standing

on American soil and well-aware of the limits on the use of deadly force against U.S. citizens and non-citizens alike within the United States. *See, e.g.* 8 C.F.R. § 287.8(a)(2). What Swartz did not know at the time he shot was whether J.A. was a United States citizen or the citizen of a foreign country, and if J.A. had significant voluntary connections to the United States. (Doc. 18 at ¶ 17). It was only after Swartz shot J.A. and learned of J.A.'s identity as a Mexican national that he had any reason to think he might be entitled to qualified immunity.[3] This Court finds that Swartz may not assert qualified immunity based on J.A.'s status where Swartz learned of J.A.'s status as a non-citizen *after* the violation. *See Moreno v. Baca*, 431 F.3d 633, 641 (9th Cir. 2005) (holding that "police officers cannot retroactively justify a suspicionless search and arrest on the basis of an after-the-fact discovery of an arrest warrant or a parole violation").[4]

This holding again contravenes that of the Fifth Circuit Court of Appeals in *Hernandez v. United States*, --- F.3d --- (2015), 2015 WL 1881566. This Court respectfully disagrees with the en banc panel's decision that "any properly asserted right was not clearly established to the extent the law requires." *Id.* at *2. In part, this may be because this Court does not characterize the question before the Court as "whether the general prohibition of excessive force applies where a person injured by a U.S. official standing on U.S. soil is an alien who had no significant voluntary connection to, and was not in, the United States when the incident occurred." *Id.* Instead, this Court focuses on whether an agent may assert qualified immunity on an after-the-fact discovery that the individual he shot was not a United States citizen; this Court concludes that qualified

---

[3] Had Swartz subsequently found that J.A. was a citizen of the United States, he could not challenge that the Constitution applied to J.A. *See Reid v. Covert*, 354 U.S. 1 (1957) (applying the Constitution to U.S. citizens abroad). Similarly, Swartz could not argue that the Constitution did not apply to legal permanent residents and perhaps even undocumented aliens who had established substantial voluntary connections with the United States. *See Ibrahim*, 669 F.3d at 994-95. Further, had J.A. been situated some thirty-five feet north in the territory of the United States, there would be no question that he would be protected by the Constitution. *Id.*

[4] Again, the Court does not reach Rodriguez' arguments that the Fifth Amendment applies if the Fourth Amendment does not. *See* Doc. 46 at 21-22. Similarly, the Court does not reach the question of whether J.A.'s Fifth Amendment rights were violated or clearly established when he was seized by Swartz.

immunity may not be asserted in this manner.

**VII.    Conclusion**

The Court finds that, under the facts alleged in this case, the Mexican national may avail himself to the protections of the Fourth Amendment and that the agent may not assert qualified immunity.

In addressing a Rule 12(b)(6) motion to dismiss, this Court must accept as true all material factual allegations in the complaint, construe the pleadings in the light most favorable to the plaintiff, and make any reasonable inferences therefrom. Applying this standard, Rodriguez has stated a claim upon which relief can be granted. J.A. was entitled to the protections of the Fourth Amendment, even as a non-citizen standing on foreign soil pursuant to both his substantial voluntary connections to the United States and *Boudemeine*'s functional approach in addressing his claim. Because Rodriguez' claim of excessive force should be analyzed under the Fourth Amendment, this Court dismisses Rodriguez' Fifth Amendment claim. Finally, Swartz cannot assert qualified immunity when he found out after-the-fact that he had exerted deadly force upon a noncitizen. Accordingly,

**IT IS HEREBY ORDERED** *granting in part* and *denying part* Swartz' Motion to Dismiss (Doc. 30). Rodriguez' claim pursuant to the Fifth Amendment is dismissed; Rodriguez' claim pursuant to the Fourth Amendment proceeds.

Dated this 9th day of July, 2015.

Raner C. Collins
Chief United States District Judge