1            IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF ARIZONA

3   Araceli Rodriguez,            )
                                  )
4           Plaintiff,            )
                                  ) 14-CV-02251-TUC-RCC
5        vs.                      )
                                  ) Tucson, Arizona
6   Lonnie Swartz,               ) May 26, 2015
                                  ) 1:30 p.m.
7           Defendant.            )
    _____ )
8
              REPORTER'S TRANSCRIPT OF PROCEEDINGS
9
                MOTION TO DISMISS HEARING
10
       BEFORE:  THE HONORABLE RANER C. COLLINS, DISTRICT JUDGE
11
    APPEARANCES
12  For the Plaintiff:
         ACLU
13       By:  LEE GELERNT, ESQ.
         125 Broad Street, 18th Floor
14       New York, New York 10004
         By:  KATHERINE DESORMEAU, ESQ.
15       39 Drumm Street
         San Francisco, California, 94111
16       Law Offices of Luis Fernando Parra, PLLC
         By:  LUIS FERNANDO PARRA, ESQ.
17       571 North Grand Ave.
         Nogales, Arizona 85621
18
    For the Defendant:
19       Law Offices of Sean C. Chapman, PC
         By:  SEAN C. CHAPMAN, ESQ.
20       100 North Stone Ave., Suite 701
         Tucson, Arizona 85701
21
    Cheryl L. Cummings, RDR-CRR-RMR
22  Official Court Reporter
    Evo A. DeConcini U.S. Courthouse
23  405 West Congress, Suite 1500
    Tucson, Arizona 85701
24  (520)205-4290

25  Proceedings Reported by Stenographic Court Reporter
    Transcript Prepared by Computer-Aided Transcription

P R O C E E D I N G S

(Call to order, 1:30 p.m.)

MR. CHAPMAN:  Good afternoon, your Honor.  Sean Chapman for Agent Swartz who is not present.

THE COURT:  Good afternoon.

MR. GELERNT:  Good afternoon, your Honor.  Lee Gelernt from the national office of the ACLU representing the plaintiff.  With me, I'll let them introduce themselves.

MS. DESORMEAU:  Good afternoon, your Honor.  Kate Desormeau from the ACLU for the plaintiff.

THE COURT:  Good afternoon.

MR. PARRA:  Good afternoon, your Honor.  Lee Fernando Parra on behalf of Rodriguez.  Thank you, your Honor.

THE COURT:  Good afternoon.

I'm not standing to intimidate you.  I'm standing because I'm told sitting is not good for you, so I've been trying it lately.

Mr. Chapman, your motion.

MR. CHAPMAN:  Your Honor, the plaintiff's claim in this case is brought under Bivens which held that money damages may be recovered against a federal agent for a violation of a plaintiff's constitutional rights.

The plaintiffs in this case have alleged that Agent Swartz' conduct violated both the Fourth and Fifth Amendments.  But the operative fact is that the decedent was

on Mexican soil when he was shot.  Thus, in order for his
Fourth and Fifth Amendment rights to be violated, the Court
would have to extend those constitutional rights to him
extraterritorially.  There's no legal precedent for this.
Moreover, there's compelling authority that the Fourth and
Fifth Amendments don't apply extraterritorially in the manner
suggested by the plaintiff.

Our position therefore:  He's entitled to dismissal
based on qualified immunity because the facts don't show that
he violated the plaintiff's constitutional rights given that
there's no extraterritorial application to either amendment,
and the rights asserted under the Fourth and Fifth Amendment
by the plaintiff were not clearly established at the time of
the event.

As you know, the Fourth Amendment governs claims of
this sort because it can be described as a seizure with
excessive and unreasonable force when someone is injured or
shot.  The parties, in their briefing, disagree as to whether
the Fourth Amendment should apply extraterritorially, and the
plaintiffs are essentially relying on the Boumediene case
while we're relying on Verdugo, Urquides, as well as the
recent en banc Fifth Circuit decision in Hernandez v. Mesa.

Hernandez v. Mesa is factually almost identical to
this case.  It was a shooting in Texas, not Arizona.  A Border
Patrol agent fired his weapon across the international border

1    and shot and killed a Mexican citizen.  Just as what occurred

2    in this case.  The Fifth Circuit in Hernandez v. Mesa held

3    that a Mexican citizen with no significant voluntary

4    connection to the U.S. who was shot on Mexican soil cannot

5    assert a claim under the Fifth Amendment.  And the Hernandez

6    court relied on the Supreme Court in Verdugo/Urquidez.

7         THE COURT:  Let me ask you a question.  How do we

8    know there was no sufficient voluntary connection with the

9    United States since there's been no --

10        MR. CHAPMAN:  It's not alleged in the Complaint.

11        THE COURT:  Okay.

12        MR. CHAPMAN:  I mean, the whole litigation at this

13   point is premised on the plaintiff's allegations in the

14   Complaint, assuming they're correct and accurate.

15        THE COURT:  All right.

16        MR. CHAPMAN:  So in that case, Hernandez, the court,

17   the en banc court unanimously decided that if the plaintiffs

18   have a constitutional claim at all, it arises under the Fourth

19   Amendment.

20        THE COURT:  Fifth, I thought.

21        MR. CHAPMAN:  The Fourth, relying on Graham v.

22   O'Connor.  And in that context there was a seizure, but

23   because it occurred extraterritorially and the

24   plaintiff/decedent had no significant voluntary connections to

25   the United States, the Fourth Amendment didn't apply

1  extraterritorial under the facts of that case which is

2  identical to this case.

3          And looking at the Verdugo case, the Supreme Court

4  case is also helpful because in that case it involved another

5  alien with no voluntary attachment to the United States.  And

6  the Court concluded in that case, where the Government

7  effected a search of the alien's property on foreign soil,

8  that the Fourth Amendment was not implicated because, again,

9  he had no voluntary connections to the United States; and

10  therefore, the Fourth Amendment would not apply

11  extraterritorially under those circumstances.

12          Just to reiterate, the decedent in this case is a

13  Mexican national.  He never entered the U.S. and he had no

14  significant voluntary connection to the U.S.

15          As to the Fifth Amendment claim, in Graham v.

16  O'Connor the Supreme Court held that where a constitutional

17  claim is covered by a specific constitutional provision, it

18  controls, not due process.  In other words, you only look at

19  the Fifth Amendment due process where no other amendment

20  applies.  The purpose of Graham is to avoid expanding the

21  concept of substantive due process where another

22  constitutional provision protects against challenged

23  governmental action -- protects individuals from challenged

24  governmental action.

25          Hernandez, again relying on Graham v. O'Connor,

1    found that the Fifth Amendment claim also failed because it

2    wasn't clearly established.  In other words, at the time that

3    this event happened which was in 2010, there was no

4    controlling case law establishing that under the specific

5    facts of that case which, again, are similar to this case,

6    there was no established law saying that the Fifth Amendment

7    would apply under those circumstances.  Our case happened in

8    2012, and I don't believe there have been any changes in the

9    law or any intervening law that would assist the plaintiff's

10   arguments in that time frame.

11          Also important is that Hernandez Court found that

12   the Boumediene analysis was inapplicable because nothing in

13   the Boumediene case which dealt with the extension of the

14   territorial reach of the Suspension Clause would extend that

15   to another constitutional provision like the Fifth Amendment.

16   In fact, it's interesting in that opinion, they say,

17   essentially, we don't know, you know, because the

18   Supreme Court has not answered that question yet for us as to

19   whether Boumediene would apply to different constitutional

20   provisions beyond the Suspension Clause.

21          But what's also important for your consideration is

22   that the Ninth Circuit, in Hamad v. Gates, specifically stated

23   that the Boumediene Court expressly confined its ruling to the

24   Suspension Clause and no other constitutional provision.

25          Also, we cited Ali v. Rumsfeld which is a

1    D.C. Circuit Court of Appeals case which found that Iraq and

2    Afghanistan detainers could not assert Fifth Amendment

3    constitutional violations for mistreatment because there was

4    no clearly established right under the Fifth Amendment that

5    would apply extraterritorially in their circumstances.  And I

6    don't believe that there is any Ninth Circuit precedent that

7    is inconsistent with Hernandez v. Mesa or conflicts with our

8    arguments here that neither the Fourth or the Fifth Amendment

9    apply in this case under the circumstances.

10            I just wanted to respond to one of the plaintiff's

11   arguments that if the Court were to grant a motion to dismiss

12   under these circumstances it would create a legal vacuum.  The

13   defendant's actions in this case are currently under review by

14   the U.S. attorney's office.  I've been informed that he is a

15   subject of a criminal investigation.  In fact, that's why I'm

16   standing here right now instead of a Department of Justice

17   attorney because the Department of Justice conflicted itself

18   out, because the possibility of a criminal investigation

19   still -- criminal Indictment still exists.

20            It is also subject to review, his actions, by the

21   FBI, the Homeland Security Office of Inspector General, the

22   D.O.J. civil rights division, and he could also seek a Federal

23   Court review of the Attorney General scope of employment

24   certification under the Westfall Act.  So --

25            THE COURT:  How would that work?

1          MR. CHAPMAN:  I was hoping you wouldn't ask me that

2     question, but my understanding is that if they request it,

3     they would get a finding as to whether or not he was acting in

4     the course and scope of his employment.  And if he wasn't,

5     then he would be subject to liability without the protections

6     that I'm talking about.

7          The plaintiff cites a lot of cases in its brief, but

8     I think more than anything they're muddying the waters.  I

9     think that the Hernandez Fifth Circuit case is directly on

10    point and its analysis is sound.  And I think that the

11    Supreme Court law that they cite is good law, still exists,

12    and it is the state of the law right now that there is no

13    Fifth Amendment claim or Fourth Amendment claim.  So for those

14    reasons we would ask that you dismiss the Complaint.

15          MR. GELERNT:  Good afternoon, your Honor.

16          THE COURT:  Good afternoon again.

17          MR. GELERNT:  Let me just jump into the conversation

18    very quickly and then return to some of the affirmative points

19    I want to make.

20          First of all, we have never in this country said

21    because there may be an executive branch oversight, whether

22    it's criminal or administrative, that extinguishes all rights

23    because we're talking about --

24          THE COURT:  They did seem to talk about that in

25    Hernandez a little bit.

1        MR. GELERNT:  Your Honor, not in the per curiam as I

2   understand it.  Let me turn to Hernandez, then, and return

3   back to the remedy issue.

4        Obviously, you are not bound by Hernandez.  It's a

5   different circuit.

6        THE COURT:  True.

7        MR. GELERNT:  And I want to stress something about

8   it.  The only time you would look to other circuit law is, of

9   course, if it's persuasive.  If the reasoning is persuasive.

10  The Fifth Circuit en banc chose not to offer an opinion.  They

11  had per curiam opinion that's two pages.  That does not lay

12  out its reasoning.  We think the result it reached was

13  absolutely wrong.  But for practical purposes, for your

14  purposes, what you would look to Hernandez for is, of course,

15  the reasoning to see how persuasive it is.  There is

16  absolutely no reasoning.  They chose not to provide reasoning,

17  and therefore we don't think of it could be of benefit to you.

18  And I'm going to explain why the result it reached was wrong.

19        The other thing I would just note about Hernandez is

20  there's some factual differences.  Mr. Hernandez was at the

21  border.  Our client was just going about his everyday life

22  business.  He happens to live at the border and just -- well,

23  walking down that street all the time, and he wasn't playing

24  around at the border.  There's also, I think most critically,

25  which I'm going get to, Ninth Circuit law that's different

1  than the Fifth Circuit.  So for all those reasons, we think

2  you ought to put <u>Hernandez</u> to the side.  Certainly no

3  reasoning to help you.

4          And just back to the no remedy, what we have here

5  is, of course, executive branch action, the Border Patrol

6  taking action.  And Mr. Chapman is saying, well, of course

7  there's a remedy if the executive branch wants to offer a

8  remedy.  Well, that's the executive branch overseeing the

9  executive branch.  We have never said in this country that

10 that can be the only remedy, the executive branch.  And just

11 as a practical matter and historical matter, the executive

12 branch has not taken a lot of action with respect to the

13 Border Patrol.  But putting that aside, even if they had, that

14 cannot be the only oversight.

15         In terms of scope of employment, I know the Fifth

16 Circuit said, well, you might have challenged scope of

17 employment.  In the Ninth Circuit, whatever the Fifth Circuit

18 may think about that issue, the Ninth Circuit in

19 <u>Alvarez-Machain</u> which we cite in our brief, has specifically

20 said that someone acting like this is within the scope of

21 their employment.  So in the Ninth Circuit they have

22 extinguished that remedy, and the only remedy we would have,

23 we think, is the <u>Bivens</u> remedies here.

24         Let me then turn to just sort of putting this case

25 in context.  We have, of course, as you know, a Border Patrol

1    agent shooting through the fence and killing a young man

2    without justification.  And that's our allegation.  That's the

3    facts as they come to you on a motion to dismiss.  Walking

4    home from playing basketball and killing him.

5          The context is extreme.  This is not a military case

6    like the D.C. Circuit cases or like Hamad which Mr. Chapman

7    just mentioned from the Ninth Circuit.  He certainly wasn't an

8    enemy combatant.  He certainly wasn't accused of a crime.

9    It's not an immigration case.  He wasn't trying to sneak into

10   the country.  There's no uncertainty about the course of

11   conduct.  It's clear and has been clear for a long time that

12   it's a criminal act to shoot someone on the other side of the

13   border whether citizen or not citizen.  That's 18 U.S.C. 1111

14   and 1112.  So this is not Verdugo where there was a sea of

15   uncertainty about how to use a warrant in another country or

16   what reasonableness is.

17         This is a case where everything except the bullet

18   hitting the young man happened on U.S. soil.  It's not where

19   some vague plan happened on U.S. soil.  All of the action

20   happened on U.S. soil.  It's not a case where there's friction

21   with another country.  The letter from Mexico makes it clear

22   and as their position in Hernandez makes it clear, they would

23   like to see there be a remedy.  Now, we're not saying that our

24   facts are necessarily true.  We believe they, of course, are

25   true; but what we are saying is the Border Patrol agent must

1    come forward and defend his actions.  There is no

2    justification for saying the Fourth and Fifth Amendments don't

3    apply under the particular circumstances here.

4         I mean, it's hard to imagine when the Fourth and

5    Fifth Amendments would apply if they're not going apply in a

6    case like this.  And I think when you look at the

7    Supreme Court -- and certainly no Supreme Court case dictates

8    a result that the Fourth and Fifth Amendments don't apply

9    here.  And I think when you actually step back and look at the

10   Supreme Court cases, they all pretty much follow the facts.

11   You know, there's a lot of doctrinal complexity in all these

12   cases, and I'm not saying that everyone agrees with every

13   decision they've reached in all these extraterritorial cases,

14   but they pretty much go by the facts.

15        I mean, Eisentrager, military allied forces during

16   World War II, I don't think it surprised a lot of people that

17   they held the Fifth Amendment wasn't applicable.  Verdugo,

18   trying to get a warrant in another country, it's probably not

19   surprising although it may have upset people that they held

20   differently.  Boumediene, I mean, I think a lot of people

21   thought they wouldn't apply the habeas corpus principles to

22   Guantanamo enemy combatants who had no voluntary connection

23   but they did.

24        And it's hard to imagine this case saying there's no

25   Fourth and Fifth Amendments rights given the circumstances

1    here.  I mean, what Mr. Chapman is asking you to do is write

2    an opinion that says a Border Patrol agent can put his gun up

3    to the fence, shoot through the fence without justification,

4    and kill a teenager, a civilian teenager 20 feet over the

5    fence and the Constitution has nothing to say about.  We think

6    no Supreme Court case remotely dictates it.  And what the

7    Supreme Court has basically said in Boumediene now is you use

8    the impractical and anomalous test.  If it's not impractical

9    and anomalous to apply the Constitution in these

10   circumstances, you do it.  And that's especially so where

11   there are fundamental rights and this is, of course, the most

12   fundamental right; the right not to be arbitrarily killed.

13           And I think ultimately the defendant doesn't really

14   make an argument that on these facts, if you apply the sort of

15   totality of the circumstances, impractical and anomalous test

16   from Boumediene, it would come out that you apply the Fourth

17   and Fifth Amendments here.  What ultimately he is saying is

18   the Fourth and Fifth Amendments don't apply across the border,

19   and essentially that's a dispositive fact, that Mr. -- that

20   the young man in this case had no connections to the U.S.,

21   meaning he didn't live in the U.S. and that type of thing, and

22   so that's a dispositive factor.  That's absolutely wrong after

23   Boumediene.  It was clear in Verdugo and Eisentrager reading

24   those cases, but it's absolutely wrong after Boumediene that

25   there's a bright line test.

1          First of all in Verdugo, the bright line test that

2     it only applies to people with a connection to the U.S. came

3     from Justice Rehnquist use of the people in the Fourth

4     Amendment.  Justice Kennedy said he's joining the opinion in

5     fundamental respects, but we don't have to guess which

6     respects he was joining.  He specifically said, I don't buy

7     that part and I will apply the impractical and anomalous

8     tests, meaning I'm going to look at the factors.  He would

9     have no reason to look at the factors in Verdugo had he not

10     been applying a multifactor test.

11          And most to the point, in Boumediene which he wrote,

12     he comes back at page 759 and 760 of the Boumediene decision

13     and cites only his concurrence, not the plurality, and he says

14     applying the impractical and anomalous test.  So I think

15     there's no question after Boumediene that Verdugo does not

16     stand for a bright line rule that the Fourth Amendment doesn't

17     apply overseas.  That the voluntary connections test is

18     dispositive.  It may be a factor, but it's certainly not

19     dispositive.

20          And Mr. Chapman brought up the Ibrahim decision from

21     the Ninth Circuit which talks about the voluntary connections

22     test, but there it was using it as a factor, not as

23     dispositive.  And it specifically said at page 995 when it

24     ended its discussion of Verdugo, Eisentrager, and Boumediene

25     that there was there was no longer a bright line test.  It

 1  went on to talk about voluntary factors test as just one

 2  factor, but it certainly can't be dispositive.  That's clear

 3  now after Boumediene.

 4       The same thing with Eisentrager.  Eisentrager turned

 5  on multiple factors, and the Supreme Court specifically talked

 6  about six factors.  These were enemy combatants, they were

 7  held by all the allies together, it was during war time, all

 8  of those factors that are not here.  You then come along to

 9  Boumediene.  Boumediene talks about Eisentrager.  Justice

10  Kennedy talked about Eisentrager and says it likewise turned

11  on practical considerations.  And so I think after Boumediene

12  what you have now is no bright line test, and that Ninth

13  Circuit made clear in Ibrahim, and said it's a multifactor

14  test.  And I think under these factors there's no question.

15       I want to make one additional point about which test

16  to apply.  Because if your Honor chooses, he doesn't even need

17  to get into Boumediene and extraterritoriality.  I think this

18  case can be thought of as either a domestic analysis or

19  perhaps one might say extraterritoriality of light.  And I

20  think that's because the Ninth Circuit has different law than

21  the Fifth Circuit, and the case we cite from the Ninth Circuit

22  in our brief is the Wang decision.  And that involved a

23  Chinese witness who U.S. prosecutors here, in this country,

24  mislead into coming here.

25       Now, the Ninth Circuit at Footnote 16 specifically

1  said the violation occurred here in the U.S., and that's

2  slightly different than our case, of course.  But the larger

3  point the Court went on to make in Footnote 16 was that you

4  don't want to artificially place beyond its control events

5  that happened overseas if all the actions are being taken by

6  U.S. officials on U.S. soil.  And I think that's a critical

7  point.  That's the difference between this case and cases like

8  Verdugo where our agents went to Mexico and worked in

9  cooperation with Mexican officials.  And in fact, in

10  Footnote 16 of Ibrahim, the Court specifically contrasted

11  Verdugo.

12         And the reason it's so critical that everything

13  happened on U.S. soil here other than the bullet hitting the

14  young man is that when we go over to another country, we have

15  to have that country's consent.  The Border Patrol, the FBI,

16  DEA cannot operate in another country without that country's

17  consent.  So when our agents go over to Mexico and work in

18  cooperation to search someone's house, like Verdugo's house,

19  Mexico has a say in it.  If they think our agents have done

20  something wrong, they can take action, they can arrest.

21  There's no black hole where our agents can escape liability.

22  Mexico has a say, they're approving it, and they can also

23  arrest those agents if those agents do anything unlawful.

24         Here what's happening is this agent is trying to

25  escape liability by saying, Well, I'm on the U.S. side of the

1  fence and I'm shooting over there.  He's a Mexican citizen so

2  therefore you can't get me with our Constitution.  But Mexico

3  also -- excuse me, Mexico also has no say because Mexico

4  cannot -- they can hold an in absentia hearing if they want,

5  but they certainly can't do anything because our agent's here,

6  unless the executive branch chooses to extradite.  And I think

7  that's the larger point that the Wang decision was making.

8  Yes, it's not directly on point, but the Court went out of its

9  way in Footnote 16 to make that point and contrast Verdugo;

10  that when everything happens on U.S. soil, you don't want a

11  sort of black hole where the other country can't get our

12  agents, but we're saying our Constitution doesn't apply to our

13  agents.

14        So I think ultimately we believe we win under

15  Boumediene, under a multifactor test.  But I don't think that

16  this Court necessarily has to go there and can use the Wang

17  decision and the reasoning of the Wang decision which is

18  different, of course, than Fifth Circuit law.

19        Let me turn, then, to the qualified immunity

20  analysis.  Mr. Chapman is saying, Well, suppose the Fourth and

21  Fifth Amendments apply.  It wasn't clearly established that

22  the Constitution applies to this young man because he was

23  overseas; therefore, he should have qualified immunity.  That

24  cannot possibly be the law.  The law on qualified immunity has

25  an important purpose:  to balance civil liberties and the

1   agent's rights.  And what it's designed to do is give an agent

2   breathing room to make reasonable mistakes so the agent, every

3   time he has to act, doesn't have to guess is this unlawful or

4   not and hesitate each time.  That's not the situation here.

5        He may not have known whether the Constitution

6   applied to this individual abroad, but he certainly knew the

7   conducted was unlawful and certainly knew that he needed to

8   hesitate.  It's not like we're sandbagging.  The criminal laws

9   very specifically prohibit this.  Again, 18 U.S.C. 1111 and

10  1112 apply to this young man across the border very clearly.

11  So it can't possibly be that you would say, well, he has

12  qualified immunity because although he knew not to shoot

13  because he could go to jail for the rest of his life, he

14  didn't know there could be a civil <u>Bivens</u> action, and

15  therefore he wasn't on notice.  That would completely pervert

16  the qualified immunity analysis.

17       And not only that, he didn't know the status of this

18  young man.  He didn't know whether he was a citizen, a

19  noncitizen, had enormous connections to the U.S. and had lived

20  here 20 years.  So he's indiscriminately firing.  He

21  fortuitously, from his standpoint, hits a noncitizen, and then

22  he turns around and says, well, it's not clearly established

23  because I hit a noncitizen.  That doesn't serve the purpose of

24  qualified immunity not to sandbag an agent after the fact.

25       Because the qualified immunity issue was brought up

1    more in the Reply brief, I think the Judge would benefit from

2    looking at Judge Tashima's decision from the Ninth Circuit in

3    Moreno v. Baca which is 431 F.3d 633.  It involved a search.

4    And parolees have less rights not to the searched.  Well, the

5    police searched this person not knowing whether he was a

6    parolee or not.  It turns out to be a parolee, and the police

7    officer said, well, it certainly wasn't clearly established.

8    What Judge Tashima said that's not the qualified immunity

9    doctrine.  That's not the purpose of the qualified immunity

10    doctrine.  You didn't know whether he was a parolee or a

11    regular citizen so you can't turn around and say, well, I

12    wouldn't maybe have done it if I -- because he had no idea

13    because he, in our case, is indiscriminately shooting.

14         So this is not the kind of situation where you apply

15    qualified immunity.  Again, Hernandez said they were going to

16    give qualified immunity in the Fifth Amendment.  They didn't

17    discuss any of these issues so we don't know what the

18    reasoning is.

19         The final point I want to talk about is the Fourth

20    versus the Fifth Amendment.  Mr. Chapman says you have to use

21    the Fourth Amendment because that's the more specific

22    provision.  That's what Graham v. Connor says.  And you can't

23    use the Fifth Amendment.  That's simply wrong.  What Graham v.

24    Connor says, what all the subsequent cases, Albright v. Oliver

25    say is if the Fourth Amendment applies, you use the Fourth

1   Amendment and not Fifth Amendment, substantive due process.

2   We think the Fourth Amendment applies here and so there's no

3   issue.

4          And we're not saying we want to double collect under

5   the Fourth and Fifth Amendment.  But if the Fourth Amendment

6   doesn't apply, Mr. Chapman can't have it both ways.  He can't

7   argue on the one hand the Fourth Amendment doesn't apply,

8   doesn't cover this case, but it still precludes the Fifth

9   Amendment.  What the Supreme Court is saying if the Fourth

10  Amendment applies, use it.  If it doesn't apply, use the Fifth

11  Amendment.

12         I think what Justice Souter said in his concurrence

13  in Albright v. Oliver is it's for homeless claims.  If

14  your Honor were to rule -- again, we don't think you should --

15  but if you were to rule the Fourth Amendment doesn't apply,

16  cover the situation, certainly we can turn to the Fifth

17  Amendment.

18         And I would just conclude along these lines:  One of

19  the things that Mr. Chapman's briefs have said is, well, you

20  would be opening up a pandora's box.  There might be limitless

21  claims:  drones, military actions.  That's absolutely not

22  true.  The thing that Justice Kennedy was doing in Boumediene,

23  the critical point he was making is look at all the

24  circumstances.  This is a complex area of the law.  You have

25  to make it fact-specific, context-specific,

1  circumstance-specific.  We're not asking for a broad ruling

2  that the Fourth Amendment and Fifth Amendments always apply.

3  We are saying under the unique circumstances of this case it

4  has to apply.

5          Boumediene necessarily understood that cases would

6  have to be decided on their facts because it refused to lay

7  down the bright line rule that the Government asked for.  And

8  I would just suggest that there is obviously not a limitless

9  class of cases in this situation because we have a U.S. agent

10  on U.S. soil, it's nonmilitary, so for all those reasons I

11  think you can lay down a fact-specific ruling that covers this

12  situation but doesn't sweep in an enormous amount of other

13  cases.

14          And I would just conclude by saying, you know,

15  Mr. Chapman's accused of us dramatizing the facts.  I don't

16  believe we have.  I believe that why he's recoiling, is the

17  facts are simply troubling.  A young man walking home from

18  playing basketball, in his home town.  He is not doing

19  anything and he shot ten times and he's dead.  And now a

20  mother has to live with the worst possible pain any parent can

21  live with, is losing a child.  I think that's about as bland

22  as you can put it, and that's the context of this case.

23          Unless your Honor has additional questions?

24          THE COURT:  I don't.

25          MR. GELERNT:  Thank you, your Honor.

1          THE COURT:  Mr. Chapman, you get the last word.

2          MR. CHAPMAN:  Well, I didn't accuse the plaintiffs

3    of dramatizing the facts.  The facts are horrible and they're

4    tragic.  What I suggested was their briefing muddies the water

5    legally, and essentially what you're being asked to do is

6    ignore the reasoning of Hernandez v. Mesa.

7          THE COURT:  He started off saying exactly that.

8          MR. CHAPMAN:  That you should ignore it.

9          And I guess I would ask you this question, which is

10   what circuit law should you then rely on that interprets the

11   Boumediene case?  And determines whether or not it goes beyond

12   the reaches of the Suspension Clause?  And the answer is there

13   is no case law on that.  The only case law there is Hernandez

14   v. Mesa and it says that it doesn't.  And it says in a

15   factually identical situation, the Fourth Amendment and the

16   Fifth Amendment do not apply extraterritorially.

17         The Plaintiffs argue that the cases that -- the

18   Supreme Court cases that we briefed are factually specific.

19   But in nowhere in those opinions, in Verdugo or the other

20   opinions does the Supreme Court say we're limiting our

21   findings to the facts of this case.  They are the law.  This

22   is the state of the law right now.  We may like it or we may

23   not like it but it's the law.  And the only circuit that has

24   addressed a factually similar situation is the Fifth Circuit,

25   and if you follow its reasoning you must grant a motion to

1    dismiss at this point.

2            THE COURT:  Question.

3            MR. CHAPMAN:  Yes, sir.

4            THE COURT:  There is a belief that he could be held

5    criminally liable for what he did, which is why you say you're

6    involved in the case, but not civilly liable because the kid

7    died on Mexican soil.

8            MR. CHAPMAN:  That is a question that reflects kind

9    of the equities of the situation and whether that's really

10    fair or not fair.  But it's also the state of the law.  It's,

11    you know, applying the case law to the facts of this case.

12    The Fourth and the Fifth Amendment don't apply

13    extraterritorially.  And a lot of people may think that's

14    wrong and that's not fair, but that's what the law is at this

15    point.

16            And it's up to the Supreme Court to say that we're

17    wrong.  That Boumediene should be extended, its analysis, to

18    the Fourth and the Fifth Amendment.  And if we're wrong, we're

19    wrong.  But we don't know that, just like the Fifth Circuit

20    didn't know it at the time.  So at this point Boumediene is

21    limited to the Suspension Clause.  And the prevailing case

22    law, Supreme Court law which hasn't been overruled, says that

23    under these circumstances there is no Fourth and Fifth

24    Amendment violation, period.

25            Plaintiff's counsel is right that the Wang case in

1  the Ninth Circuit is different from the constitutional

2  violation that occurred here.  In Verdugo, there necessarily

3  was Government action in the United States because the DEA was

4  directing the investigation in this case.

5          One final point.  Essentially the argument in

6  plaintiff's briefs that the limits of the Fourth and Fifth

7  Amendments are well known to the Border Patrol, that's not the

8  proper analysis.  The proper analysis was explained in Ali v.

9  Rumsfeld.  And basically it says that the proper inquiry is

10  not whether the Constitution prohibits the conduct at issue

11  but whether the rights pressed by the plaintiff under the

12  specific amendment were clearly established at the time.  So

13  it's not whether the agent knew he was doing something wrong,

14  it's whether a clearly established constitutional right was

15  violated.

16          We don't look into the agent's mind in attempt to

17  figure that out.  We look at the law.

18          THE COURT:  So he could know that he was doing

19  something wrong, but not know that the constitution did or did

20  not prohibit it.

21          MR. CHAPMAN:  That's correct.  If you look at Ali v.

22  Rumsfeld, that's what it says.  So in this context if we

23  assume that the allegations in the plaintiff's complaint are

24  true, that this was simply an unprovoked attack and he killed

25  this Mexican citizen without any legal justification, you

1    still have to apply that analysis, that case law, and ask

2    whether this was a clearly established right; in other words,

3    whether the Fourth and the Fifth Amendments apply

4    extraterritorially to this situation.  That's what you're

5    supposed to look at.

6          Now, his mens rea or his belief, that may impact

7    some other thing.  I mean, it may impact his employment status

8    or subject him to criminal prosecution, but under the analysis

9    in the civil law, we look at whether it's a clearly

10   established right.

11          THE COURT:  Thank you.

12          MR. CHAPMAN:  Thank you.

13          THE COURT:  I have a feeling no matter what I rule,

14   that will not be the last word.

15          MR. CHAPMAN:  I think you're probably right.

16          THE COURT:  Thank you both.  I'll take the matter

17   under advisement.

18      (Proceedings concluded at 2:06 p.m.)

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3              I, Cheryl L. Cummings, certify that the

4    foregoing is a correct transcript from the record of

5    proceedings in the above-entitled matter.

6

7                    Dated this 3rd day of August, 2015.

8                    /s/Cheryl L. Cummings

9                    Cheryl L. Cummings, RDR-CRR-RMR
                     Federal Official Court Reporter
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25